UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — — — — — — — —

KHIN SAN KYI,

Plaintiff,

v.

4C FOODS CORP., AMALGAMATED LIFE
INSURANCE CO., and TEAMSTERS
LOCAL 277 WELFARE FUND,

Defendants.

— — — — — — — — — — — — — — — — — — — — — — — — — —

RECEIVED
OCT 14 2022
J.P.
PRO SE OFFICE

CV 22-6301

ORIGINAL

Docket No.

COMPLAINT

Chen, J.

Bloom, M.J.

Plaintiff KHIN SAN KYI, appearing Pro Se,[1] as and for her Complaint, alleges as

follows:

## PRELIMINARY STATEMENT

1. This is a civil action pursuant to the Employee Retirement Income Security Act of

1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), the Family Medical and Leave Act, 29 U.S.C. §

2601, *et seq.* ("FMLA'), and for breach of contract. Plaintiff seeks damages, injunctive relief,

and reasonable attorney's fees and costs, for the Defendants' wrongful denial of life insurance

benefits to Plaintiff.

## JURISDICTION

2. This action asserts claims under ERISA and FMLA. Accordingly, this Court has

original jurisdiction over this action pursuant to 28 U.S.C. § 1331.

---

[1] This Pro Se Amended Complaint was prepared with the assistance of the City Bar Justice Center's Federal Pro Se
Legal Assistance Project.

3. The state law claims asserted in this action are so related to the claims over which the Court has original jurisdiction that they form part of the same case or controversy. Accordingly, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

4. Defendant 4C Foods Corp. resides in this district and all defendants reside in New York State. Accordingly, venue is proper under 28 U.S.C. § 1391(b)(1).

5. A substantial part of the events or omissions giving rise to the claims in this action occurred in the Eastern District of New York. Accordingly, venue is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

6. Plaintiff Khin San Kyi ("Plaintiff") currently resides at 145 Leonard Road, Rochester, NY 14616. Plaintiff is the widow of Tun Win ("Win"), who passed away on April 10, 2020.

7. 4C Foods Corp. ("4C Foods") is a domestic business corporation registered with the New York Department of State, DOS ID # 82983. 4C Foods' principal place of business is located at 580 Fountain Avenue, Brooklyn, NY 11208. Win was an employee of 4C Foods for approximately 11 years.

8. Teamsters Local 277 Welfare Fund ("the Welfare Fund") is a non-profit corporation. The Welfare Fund's principal place of business is located at 14 Front Street, Hempstead, NY 11550.

9. Amalgamated Life Insurance Corp. ("Amalgamated Life") is a domestic corporation registered with the New York Department of Financial Services, NAIC #

60216.  Amalgamated Life's principal place of business is located at 333 Westchester Avenue, White Plains, NY 10604.  Until 2019, Amalgamated Life provided a group life insurance policy that covered the Welfare Fund's members.

## FACTS

10. Win worked for 4C Foods from in or about 2008 until 2019.  Through his employment, Win was a member of Teamsters Local 277.

11. 4C Foods and the Welfare Fund maintained an employee welfare benefit plan for the purpose of providing to its participants and their beneficiaries, through the purchase of insurance or otherwise, health, prescription drug, optical, dental, and life insurance benefits.

12. Win was a participant in the Welfare Fund while employed at 4C Foods.

13. 4C Foods and Teamsters Local 277 maintained a separate Pension Fund for the purpose of providing participants with retirement benefits.  The Pension Fund's principal place of business is also located at 14 Front Street, Hempstead, NY 11550.

14. Win was a participant in the Pension Fund while employed at 4C Foods.

15. Win's employee benefits during the time he worked at 4C Foods are described in a Summary Plan Description ("SPD").  A copy of the relevant portions of the SPD are attached hereto as Exhibit A.

16. The SPD informed employees of the following: "Life insurance covers your life but not the lives of your dependents.  If you are actively working in covered employment with a year or more of service, your life is insured for $10,000."  Exhibit A, SPD p. 58.

17. Because Win had worked in covered employment with 4C Foods for more than one year, his beneficiary was entitled to a death benefit of $10,000.

18. In response to the question "What Happens to Your Life Insurance If You Are Disabled?" the SPD states as follows:

> If you become disabled while you are working in covered employment before you reach age 60, but after the effective date of your insurance, the full amount of your life insurance protection will be extended. To qualify for this extended life insurance during a disability, your disability must prevent you from engaging in any occupation for compensation or profit.

Exhibit A, SPD p. 59.

19. Win was 51 years old when he became totally disabled in February 2019. Win remained totally disabled until his death at the age of 52.

20. Plaintiff was the named beneficiary on Win's life insurance policy provided by the Welfare Fund. The policy was issued and serviced by Amalgamated Life.

21. Win was hospitalized at Coney Island Hospital beginning in March 2019.

22. In March 2019, Win was diagnosed with early onset dementia with behavioral disturbances, major neurocognitive disorder, and severe memory loss. See Certification of Health Care Provider Form for an Employee's Serious Health Condition under the Family Medical Leave Act, attached hereto as Exhibit B.

23. An Eligibility Notice dated March 8, 2019 issued by ADP, which processed payroll and employee benefits for 4C Foods, stated that it had retroactively approved Win's request for block leave under the FMLA, beginning February 11, 2019. A copy of the March 8, 2019 Eligibility Notice is attached hereto as Exhibit C.

24. In an email dated April 19, 2019, an agent of 4C Foods, Carol Arias, informed the Welfare Fund Manager, Frank Asprea ("Asprea") that Win "has been on FMLA and recently resigned." A copy of the April 19, 2019 email is attached hereto as Exhibit D.

25. 4C Foods' April 19, 2019 representation that Win "had recently resigned" was false.

26. In a letter dated April 24, 2019, the Welfare Fund advised Win that his employee benefits were to be cancelled as of May 1, 2019, because he had not worked a sufficient number of days during the months of March and April 2019. A copy of the April 24, 2019 letter is attached hereto as Exhibit E.

27. Among other things, the April 24, 2019 letter stated that Win had 60 days to convert his life insurance policy from a group policy to an individual policy.

28. The date that Win's benefits were to be terminated, May 1, 2019, was during a period that Win was on FMLA leave.

29. The April 24, 2019 letter was addressed to Win at 1751 Dahill Road, #2R, Brooklyn, NY 11223. Win and his family had not resided at 1571 Dahill Road in Brooklyn since June 2018. Win did not receive the April 24, 2019 letter.

30. In April 2019, Win and his family lived at 2261 West 7th Street, Brooklyn, NY 11223.

31. In 2019, Win received all other communications regarding payroll and employee benefits at the family's residence at 2261 West 7th Street, Brooklyn NY 11223. See Exhibit C; Aetna Life Insurance Company Benefit Information, attached here to as Exhibit F.

32. In a letter dated May 3, 2019, ADP informed Win that his FMLA leave period would conclude on May 6, 2019. A copy of the May 3, 2019 letter is attached hereto as Exhibit G.

33. On May 17, 2019, while hospitalized and with the assistance of the New York Legal Assistance Group ("NYLAG"), Win executed a Power of Attorney, naming Plaintiff as his agent. A copy of the Power of Attorney is attached hereto as Exhibit H.

34. In a letter dated May 29, 2019, ADP informed Win that "4C Foods has approved your request for a leave of absence extension." See copy of May 29, 2019 letter, attached hereto as Exhibit I, p. 1. No end date was stated for the approved leave of absence extension.

35. The May 29, 2019 letter also stated that if Win did not return to work at the end of his FMLA leave, his employee health benefits "will be cancelled as of May 31, 2019." Exhibit I, p.2. This statement was inconsistent with April 24, 2019 letter from the Welfare Fund, which stated that Win's employee benefits were to be cancelled as of May 1, 2019. See Exhibit E.

36. In June 2019, the Welfare Fund discontinued its group life insurance policy with Amalgamated Life. The period for members to convert to an individual policy was 31 days from notification if the employee had been notified of the right to convert. The conversion period was extended to 90 days if the employee had not received notice.

37. Win never received notice of the Welfare Fund's discontinuation of the group life insurance policy or of his right to convert to an individual policy.

38. In July 2019, Plaintiff was informed that Win's illness was terminal.

39. Given the seriousness of her husband's illness and unaware of the Welfare Fund's cancellation of the group life insurance policy for 4C employees, Plaintiff called the Welfare Fund in July 2019 to inquire about Win's benefits. Exhibit J, Statement of Plaintiff.

40. Plaintiff spoke with Asprea, the Fund Manager, during the July 2019 call. Plaintiff requested an interpreter because she speaks Burmese and has limited proficiency in English. Asprea told Plaintiff that the Fund could not provide an interpreter.

41. Plaintiff was able to communicate to Asprea that Win was very ill. Plaintiff asked Asprea for information about Win's "union benefits." Asprea requested Win's date of birth and then informed Plaintiff that Win was not yet eligible for his pension.

42. Although Asprea provided information to Plaintiff regarding Win's Pension Fund benefits during the July 2019 call, he did not communicate any information about Win's Welfare Fund benefits.

43. Plaintiff called Asprea a second time in July 2019. Plaintiff once again asked Asprea if an interpreter could be provided. Asprea told Plaintiff that the Welfare Fund did not have interpreters.

44. On October 28, 2019, Plaintiff traveled to the Welfare Fund's office in Hempstead, New York, with a social worker from Coney Island Hospital. The social worker and Plaintiff met with Asprea at that time.

45. Asprea asked Plaintiff if Win had died. Plaintiff informed Asprea that Win was totally disabled and had been since February 2019 but was still alive.

46. During the October 28, 2019 meeting, Plaintiff learned for the first time that Win's employee benefits had been terminated in June 2019.

47. Win's benefits were terminated during a time period in which he was totally disabled.

48. Win's benefits were terminated during a time period in which he was on extended leave, without an established end date, as granted by 4C Foods.

49. During the October 28, 2019 meeting, Asprea told Plaintiff that he had sent a letter to Win, advising him that his employee benefits would be cancelled.

50. Plaintiff told Asprea that Win never received a letter regarding life insurance or other employee benefits provided by the Welfare Fund.

51. During the October 28, 2019 meeting, Asprea told Plaintiff that he would check with the life insurance company and get back to her. After this meeting, Asprea never communicated with Plaintiff again regarding Win's life insurance.

52. During the October 28, 2019 meeting, Asprea gave Plaintiff a letter regarding Win's pension benefits. A copy of this letter is attached hereto as Exhibit K.

53. In November 2019, Win was transferred from Coney Island Hospital to a long-term care facility. See March 6, 2020 letter from the Medicaid Coordinator, Resort Nursing Home, attached hereto as Exhibit L.

54. In March 2020, Plaintiff requested assistance from NYLAG in her attempts to obtain information from the Welfare Fund about Win's benefits.

55. On March 9, 2020, NYLAG attorney Debra Wolf ("Wolf") wrote to Asprea on behalf of Plaintiff. In her letter, Wolf clarified Plaintiff's situation and requested that the Welfare Fund extend Win's life insurance coverage in accordance with the SPD provision that required such an extension in the event a plan participant became totally disabled. See March 9, 2020 letter, a copy of which is attached hereto as Exhibit M.

56. Win passed away on April 10, 2020, while he was still in a long-term care facility.

57. Upon information and belief, Win never resigned his employment with 4C Foods, and he remained on leave until the time of his death.

58. Wolf received a response to her March 9, 2020 letter from Denis P. Duffey, Jr. ("Duffy"), counsel for the Welfare Fund, by letter dated August 4, 2020. A copy of the August 4, 2020 letter is attached hereto as Exhibit N.

59. In the August 4, 2020 letter, Duffy stated that Plaintiff's request to extend Win's life insurance benefits due to his total disability was denied. Exhibit N, p. 5.

60. In the August 4, 2020 letter, Duffy also stated that after Plaintiff's meeting with Asprea in October 2019, Asprea "contacted the insurer to ask whether there was any basis for coverage for the Participant under the Policy. The insurer advised the Fund that the Participant was not eligible for any benefit because he did not timely apply for the conversion of the Policy to an individual policy." Exhibit N, p.2.

61. Duffy stated further in his August 4, 2020 letter that following receipt of Wolf's March 9, 2020 letter, "the Fund Office contacted the insurer again to request a review of whether benefits under the Policy could be paid and forwarded the insurer [Wolf's] letter." Exhibit N, p. 2. The insurer's response, dated May 13, 2020, was that "a participant must be deemed continuously disabled for any occupation for nine consecutive months in order to be eligible for a waiver of premium." *Id.*

62. In a letter dated September 29, 2020, Wolf requested that the Welfare Fund furnish documents relevant to the claim denial. A copy of the September 29, 2020 letter is attached hereto as Exhibit O.

63. Wolf received a letter from the Welfare Fund's counsel dated November 2, 2020, in response to her request for documents. A copy of the November 2, 2020 letter is attached hereto as Exhibit P.

64. Wolf sent an appeal letter dated March 8, 2021, regarding the Welfare Fund's denial of benefits. A copy of the appeal letter is attached hereto as Exhibit Q.

65. In a letter dated March 29, 2021, Duffy notified Wolf that the Welfare Fund had denied the appeal. A copy of the March 29, 2021 letter is attached hereto as Exhibit R.

66. Accordingly, Plaintiff has exhausted her administrative remedies under ERISA.

## FIRST CAUSE OF ACTION:
## ERISA VIOLATION – WRONGFUL DENIAL OF BENEFITS

67. Win did not receive notice of the cancellation of his life insurance policy by the Welfare Fund or of his right to convert to an individual policy.

68. Under the SDP, Win was entitled to an extension of the life insurance policy while he was totally disabled.

69. Win was totally disabled from February 2019 until his death in April 2020.

70. Plaintiff is the named beneficiary of Win's life insurance policy.

71. Plaintiff properly made a claim for the death benefit.

72. Plaintiff exhausted the administrative appeal process regarding her request for the death benefit.

73. Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff is entitled to recover the death benefit under the terms of Win's employee benefit plan.

## SECOND CAUSE OF ACTION:
## ERISA VIOLATION – BREACH OF FIDUCIARY DUTY

74. In July 2019, Plaintiff informed Asprea that Win was terminally ill and requested information from Asprea regarding Win's employee benefits.

75. In response, Asprea told Plaintiff only that Win was not yet entitled to receive his pension.

76. Asprea was acting in his fiduciary capacity on behalf of the Welfare Fund when he communicated with Plaintiff in July 2019.

77. During the July 2019 call, Asprea was aware that Plaintiff had limited proficiency in the English language.

78. Asprea's failure to provide information about the cancellation of the Welfare Fund's group life insurance policy, despite Plaintiff's inquiries regarding Win's employee benefits, prevented Plaintiff from attempting to convert the policy within the allowed period.

79. Under these circumstances, Asprea's failure to provide critical information regarding Win's life insurance benefits to Plaintiff during the call in July 2019 constituted a breach of fiduciary duty. 29 U.S.C. § 1132(a)(3).

### THIRD CAUSE OF ACTION:
### THE WELFARE FUND AND AMALGAMATED LIFE SHOULD BE ESTOPPED FROM DENYING THE DEATH BENEFIT TO PLAINTIFF

80. The Summary Plan Description provided to Win by the Welfare Fund constituted a promise to Win and his beneficiary regarding his entitlement to benefits.

81. Plaintiff and her deceased husband relied on the information provided in the Summary Plan Description.

82. Based on the information provided in the SPD, Plaintiff had a reasonable expectation that Win's life insurance policy would be extended during the period that he was totally disabled.

83. Asprea's failure to provide information to Plaintiff in July 2019 about the cancellation of the Welfare Fund's group life insurance policy, despite Plaintiff's inquiries about Win's employee benefits, prevented Plaintiff from attempting to convert the life insurance policy within the allowed period.

84. The termination of Win's life insurance policy by the Welfare Fund resulted in the loss of benefits to which Plaintiff was entitled as Win's beneficiary.

85. Defendants' cancellation of Win's life insurance policy occurred without notice to him and while he was on approved leave.

86. Accordingly, the Welfare Fund and Amalgamated Life should be estopped from claiming that Plaintiff is not entitled to the death benefit.

## FOURTH CAUSE OF ACTION:
## VIOLATON OF FMLA BY 4C FOODS

87. Win was granted FMLA leave by 4C from February 11, 2019 through May 6, 2019. See Exhibit G.

88. The April 19, 2019 email from 4C Foods to the Welfare Fund Manager stating that Win "has been on FMLA and recently resigned" (Exhibit D) interfered with Win's rights under the Family and Medical Leave Act, in violation of 29 U.S.C. § 2615(a)(1).

## FIFTH CAUSE OF ACTION:
## VIOLATION OF FMLA BY THE WELFARE FUND

89. The Welfare Fund's attempt to cancel Win's benefits as of May 1, 2019 occurred during a time that Win was on FMLA leave that had been approved by 4C Foods.

90. The Welfare Fund's purported termination of benefits as of May 1, 2019 interfered with Win's rights under the Family and Medical Leave Act, in violation of 29 U.S.C. § 2615(a)(1).

## SIXTH CAUSE OF ACTION:
## BREACH OF CONTRACT BY 4C FOODS
## AND THE WELFARE FUND

91. A contract existed between Win and Defendants 4C Foods and between Win and the Welfare Fund regarding his employee benefits.

92. Win performed pursuant to the contract.

93. Defendants 4C Foods and the Welfare Fund failed to perform under the contract by denying Plaintiff the death benefit under the life insurance policy that Win was entitled to by virtue of his employment with 4C Foods.

94. As a result, Plaintiff has sustained damage.

**WHEREFORE**, Plaintiff requests the following relief:

A.      For the ERISA violations, an injunction prohibiting the Defendants from denying to Plaintiff the value of the death benefit under Win's life insurance policy and other appropriate equitable relief and recovery of the benefits to which Plaintiff is entitled, pursuant to 29 U.S.C. § 1132(a); and reasonable attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(1);

B.      For the FMLA violations, an award of damages including but not limited to, the value of the death benefit under Win's life insurance policy, with interest; such equitable relief as may be appropriate; and reasonable attorney's fees and costs pursuant to 29 U.S.C. § 2617(a);

C.      For the Defendants' breach of contract, an award of damages including but not limited to, the value of the death benefit under Win's life insurance policy, with interest; and

D.      Such other and further relief as the Court deems just and proper.

Dated:   October __11__, 2022
         Rochester, New York

_____
Khin San Kyi

Mailing Address:
145 Leonard Road
Rochester, NY 14616
Telephone: 347-447-6878
Email: kskyi0791@gmail.com

By certified mail to:

Secretary of Labor
U.S. Department of Labor
Office of the Secretary
200 Constitution Avenue NW
Washington, DC 20210


Secretary of the Treasury
U.S. Department of the Treasury
Office of the Secretary
1500 Pennsylvania Avenue NW
Washington DC 20220

# EXHIBIT A

**Teamsters Local 277 Welfare Fund**
14 Front Street, Hempstead, New York 11550
Telephone (516) 505-1623

Dear Welfare Fund Participant:

We are pleased to present you with this Summary Plan Description (SPD) for the Teamsters Local 277 Welfare Fund (Plan).

The Plan provides benefits for eligible employees of employers who are required to contribute to the Plan under a collective bargaining agreement, participation agreement or other agreement with the Union or the Plan.

This SPD is designed to provide you with a simple explanation of the most important features of the Plan. We urge you and your family to read this SPD carefully so that you will understand the Plan as it applies to you. This SPD describes the provisions of the Plan as of January 1, 2014, although significant changes to the Plan will become effective March 1, 2014, as described in this SPD.

To the extent that any of the information contained in this SPD is inconsistent with the Trust Agreement establishing the Plan, or applicable collective bargaining, participation, or other agreements (collectively "official Plan documents"), the official Plan documents will govern in all cases. Please note that the Trustees reserve the right to change or end the Plan (or any of its benefits) at any time in their sole and absolute discretion. The existence of the Plan is not an offer or contract of employment, nor does it limit your employer's ability to end your employment.

Please call the Fund Office at the number above any time you have questions regarding your Plan benefits.

We suggest that you keep this SPD in your permanent records for future reference.

With our very best wishes,

Welfare Fund Board of Trustees

# Contents



| | | |
|---|---|---|
| **1.** | **Your Plan at a Glance** | **3** |
| **2.** | **Basic Information** | **6** |
| | Teamsters Local 277 Welfare Fund ............................................................. | 6 |
| | How to Use This Booklet ........................................................................... | 6 |
| | Who Pays the Cost of the Plan? .................................................................. | 7 |
| | Who Is Covered? ........................................................................................ | 7 |
| | Report Any Family Status Changes ............................................................. | 9 |
| | When Coverage Begins ............................................................................... | 9 |
| | Pre-Existing Conditions .............................................................................. | 10 |
| | When Coverage Ends .................................................................................. | 11 |
| | Family and Medical Leave Act .................................................................... | 12 |
| | The Uniformed Services Employment and Reemployment Rights Act of 1994 .... | 12 |
| | When Coverage Is Reinstated ..................................................................... | 15 |
| **3.** | **Health Care Coverage** | **16** |
| | Medical Certification Program ................................................................... | 16 |
| | Emergency Care Coverage ......................................................................... | 17 |
| | Basic Hospital Coverage (Covered Hospital Services, Hospital Limitations or Exclusions, When Benefits Are Extended) ............ | 17 |
| | Major Medical Coverage ............................................................................ | 20 |
| | How the Plan Works with Other Coverage (Coordination of Benefits, Medicare Coverage, Automobile No-Fault Coverage, Liability Coverage, Workers' Compensation Coverage, Government Coverage) ........ | 30 |

# 7. Life Insurance Coverage



## What Is the Amount of Your Life Insurance?

Life Insurance covers your life but not the lives of your dependents. If you are actively working in covered employment with a year or more of service, your life is insured for $10,000. If you have less than a year of service, your life is insured for $3,000.

## How to Name Your Beneficiary

**SUMMARY**

Life insurance:

* $10,000 with a year or more of service
* $3,000 with less than a year of service
* Extension of coverage while disabled
* Conversion to an individual policy available

Your beneficiary is the person or persons you choose to receive your life insurance when you die. You name your beneficiary by completing a written form and filing it with the Local 277 Welfare Fund Office. To change your beneficiary, obtain a change of beneficiary form from the Fund Office, fill it out and return it. A change of beneficiary does not take effect until a signed form, authorizing the change, is received by the Local 277 Welfare Fund Office.

If you name more than one beneficiary, you may specify different amounts to be paid to each. If you do not specify, your beneficiaries will receive equal shares of your life insurance.

If a beneficiary does not survive you, or if there is no beneficiary, that share of your life insurance will be paid according to the following order:

* spouse
* children
* parents
* brother(s) and sister(s)
* the executor or administrator of your estate

After your death, your beneficiary may designate a person to receive any amount that would be payable if your beneficiary dies.

# How Payment Is Made

Payment is typically made as a lump sum paid to your beneficiary. You or your beneficiary may also choose to have payments made in installments instead of a lump sum. If you do not elect a method of payment, your beneficiary may do so after your death.

If your beneficiary is a minor or a person who cannot handle his/her own affairs, payment will be made to a legally appointed representative. If a legal guardian has not been appointed, any minor's share may be paid in monthly installments not exceeding $50 a month to the adult(s) that have assumed the custody and principal support of the minor.

# What Happens to Your Life Insurance If You Are Disabled

If you become disabled while you are working in covered employment before you reach age 60, but after the effective date of your insurance, the full amount of your life insurance protection will be extended. To qualify for this extended life insurance during a disability, your disability must prevent you from engaging in any occupation for compensation or profit.

Your protection will be extended up to the first anniversary of the date premium payments stop, so long as you remain totally disabled. If proof of your continued total disability is submitted to the Fund Office three months before each anniversary of the date premium payments stop, your life insurance protection may be extended further.

After your group Life Insurance protection has been extended for two full years, the Fund will have the right to have its medical representative examine you when it may reasonably require, but not more than once a year.

If you die, your beneficiary must provide proof to the Fund within one year that your total disability continued to the date of your death.

This protection will be discontinued when you are no longer disabled, fail to submit to an examination, or fail to furnish required proof. If your insurance protection is discontinued, you have the right to convert your Group Life Insurance to an Individual Life Insurance policy.

Contact the Fund Office for forms to file proof of your total disability.

# What Happens to Your Life Insurance After Leaving Covered Employment

If you leave covered employment, your group Life Insurance protection continues for 31 days. During this period you can convert your Group Life Insurance to an Individual Life Insurance policy without having a medical examination, as explained in the Group Policy and your certificate.

# How to Convert Your Life Insurance Coverage

If your Group Life Insurance coverage ends, you will have the opportunity to convert your coverage to an individual policy. An individual policy is available in an amount equal to your group policy. You will not be required to take a medical exam. When you purchase an individual policy, the premium payments will be based on your current age. If you choose to convert your group insurance, you must do so within 31 days of the date your group insurance ends.

# EXHIBIT B

# Certification of Health Care Provider Form for an Employee's Serious Health Condition under the Family Medical Leave Act (FMLA)

This form will need to be completed for your leave of absence. Please fax your completed documentation to the ADP TotalSource Leaves Administration at 866-485-1227. You may also scan and email the documentation to TotalSource.FMLA@adp.com. Any questions regarding this form should be directed to the ADP TotalSource Leaves Administration at 866-400-6011.

## SECTION I: For Completion by the EMPLOYER

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies, and in accordance with 29 C.F.R. § 1635.9, if the Genetic Information Nondiscrimination Act applies.

Employer name and contact: ___4C Foode CoRP___

Employer email address: ___580 Fountain Avenue, Brooklyn, NY, 11208___

Employee's job title: ___Factory___

Regular work schedule: ___Full time___

Employee essential job functions: _____

Check if job description is attached: ☑

## SECTION II: For Completion by the EMPLOYEE

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections, 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request, 29 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form, 29 C.F.R. §825.305(b).

Employee Name: ___Tun Win___          Last 4 Digits of SSN ___1511___

Reference Number: ___C539G9323___     *(This reference number is provided by ADP TotalSource)*

Employee Email Address: ___wadblytun6@gmail.com___    *Optional. If an email address is provided, ADP TotalSource will send FMLA information to the home address we have on file. Please note: You must have access to this email while on your leave of absence. By providing your email address above, you have agreed to receive your FMLA information electronically, where applicable by law.*

Page 1 of 4

ADP is a registered trademark of ADP, LLC. Copyright © 2015 ADP, LLC.



**SECTION III: For Completion by the HEALTH CARE PROVIDER**
**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address: _____
Coney Island Hospital, 2601 Ocean Pkwy, Brooklyn, NY, 11235

Type of practice / Medical specialty:
Internal medicine

Telephone: (718) 616-3000          Fax:( )

**PART A: MEDICAL FACTS**
1. Approximate date condition commenced: 3/21/2019

Probable duration of condition: _____

**Mark below as applicable:**
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
☐ No ☑ Yes. If so, dates of admission:
1/26/19 – 3/21/2019 ~ present

Date(s) you treated the patient for condition:
2/26/2019, 3/21/2019 —— Present.

Will the patient need to have treatment visits at least twice per year due to the condition? ☐ No ☐ Yes.

Was medication, other than over-the-counter medication, prescribed? ☐ No ☑ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)? ☐ No Yes ☑. If so, state the nature of such treatments and expected duration of treatment:
To regain physical strength.

Page 2 of 4
adp.com



2. Is the medical condition pregnancy? ☑No ☐Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ☐ No ☐ Yes.

If so, identify the job functions the employee is unable to perform:

_____
_____

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

*pt is having early onset progressive Dementia y*
*unknown etiology*

_____
_____
_____

## PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ☐No ☐Yes. *N/A*
If so, estimate the beginning and ending dates for the period of incapacity: *N/A*

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ☐No ☑Yes.

If so, are the treatments or the reduced number of hours of work medically necessary?
☐No ☑Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:
*N/A*

Estimate the part-time or reduced work schedule the employee needs, if any:

_*N/A*_ hour(s) per day; _*N/A*_ days per week from _*N/A*_ through _*N/A*_

7. Will the condition cause episodic flare-ups [...] his/her job functions? ☐No ☐Yes. N/A

Is it medically necessary for the employee to be absent from work during the flare-ups?

☐ No Yes☐ If so, explain:

N/A   currently pt is having progressive dementia, cognitive/behavioral disturbances.

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: N/A    times per N/A    week(s) month(s) N/A

Duration: N/A    hours or N/A    day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.

_____

Signature of Health Care Provider                    Date    4/12/19

## PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the [...]



SECTION III: For Completion BY THE HEALTH CARE PROVIDER

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Do not provide information about genetic tests, as defined in 29 C.F.R. § 1635.3(f), genetic services, as defined in 29 C.F.R. § 1635.3(e), or the manifestation of disease or disorder in the employee's family members, 29 C.F.R. § 1635.3(b). Please be sure to sign the form on the last page.

Provider's name and business address:  _DR SONDE , CONEY ISLAND_

_HOSPITAL_

Type of practice / Medical specialty:

_INTERNAL MEDICINE_

Telephone: ( _718_ )  _616   3000_.     Fax:( _3364_ )

**PART A: MEDICAL FACTS**

1. Approximate date condition commenced:  _3/21/2019_

Probable duration of condition:  _chronic_

**Mark below as applicable:**
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
☐ No ☑ Yes. If so, dates of admission:

_3/21/2019 — now_

Date(s) you treated the patient for condition:

Will the patient need to have treatment visits at least twice per year due to the condition? ☐ No ☑ Yes.

Was medication, other than over-the-counter medication, prescribed? ☐ No ☑ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)? ☐ No Yes ☑. If so, state the nature of such treatments and expected duration of treatment:

_Physical therapist , OT_

**Page 2 of 4**

ADP and the ADP logo are registered trademarks of ADP, LLC. Copyright © 2015 ADP, LLC

2. Is the medical condition pregnancy? ☐No ☐Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ☐ No ☑Yes.

If so, identify the job functions the employee is unable to perform:

_____

_____

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

*Early onset dementia*

*Visual hallucinations*

_____

_____

**PART D: AMOUNT OF LEAVE NEEDED**

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ☐No ☑Yes.
If so, estimate the beginning and ending dates for the period of incapacity: 3/21/2019 —

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ☐No ☑Yes.

     If so, are the treatments or the reduced number of hours of work medically necessary?
     ☐No ☑Yes.

     Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

     _____

     Estimate the part-time or reduced work schedule the employee needs, if any:

     _____ hour(s) per day; _____ days per week from _____ through _____

**Page 3 of 4**

® and the ADP logo are registered trademarks of ADP, LLC. Copyright © 2015 ADP, LLC



7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ☐No ☑Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups?

☐ No Yes☑ If so, explain: _*early onset    dementia*_

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: _____ times per _____ week(s) month(s) _____

Duration: _____ hours or _____ day(s) per episode

ADDITIONAL INFORMATION (IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER)

_____

_____

_____

_____

_____

_____

_____

_____

_____

Signature of Health Care Provider          Date  5/2/2019

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500.Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210.

| | CONDITIONS |
|---|---|
| 1. | Dementia with behavioral disturbance |
| 2. | Major neurocognitive disorder – severe |
| 3. | Memory loss – severe |
| 4. | |
| 5. | |

**B.** If you are not working, when did you stop working?

**C.** **Height without shoes:**_____feet_____inches    Weight without shoes:_____pounds   59.4 kg

**D.** **Medical Sources**

Please list any doctors, hospitals, clinics, therapists, or _____ ums you have visited because of your conditions.

| NAME | ADDRESS | PHONE NUMBER (with area code) | DATE FIRST SEEN OR ADMISSION DATE | DATE LAST SEEN OR DISCHARGE DATE |
|---|---|---|---|---|
| Coney Island Hospital | 2601 Ocean Parkway, Brooklyn | (718) 616-3000 | 3/20/19 | currently |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Form SSA-3381 (12-2009) Destroy prior editions

Please list any medicines you take and why you take ~~them~~ doctor's name.

| NAME OF MEDICINE | WHY YOU TAKE IT | PRESCRIBED BY |
|---|---|---|
| Gabapentin PO 200mg BID | Neurocognitive disorder-severe | Alla Bogorodovsky |
| Olanzapine PO 2.5 mg Nightly | ↓ | |
| Trazodone PO 25mg PRN for sleep | | ↓ |
| Multivitamin PO | Nutrition | |
| | | |
| | | |

## F.  Medical Tests

Please list any medical tests you had or are going to have in the future.

| NAME OF TEST | PROVIDER WHO SENT YOU | DATE(S) |
|---|---|---|
| CT head without contrast | Anderson-Chernishof, Marissa, MD | 4/21/2019 |
| MRI brain w/o/without contrast | Bhuiyan, Reham Akther, MD | 3/25/2019 |
| US Abdomen | Simedia Scott MD | 5/5/2019 |
| | | |
| | | |
| | | |

## G.  Job History

List the jobs (up to 5) that you have had in the 15 years before you became unable to work because of your physical or mental conditions. List your most recent job first.

| JOB TITLE (e.g., cook) | TYPE OF BUSINESS (e.g., restaurant) | DATES WORKED | | HOURS PER DAY | DAYS PER WEEK | RATE OF PAY | |
|---|---|---|---|---|---|---|---|
| | | FROM Mo/Yr | TO Mo/Yr | | | Amount | Frequency |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# EXHIBIT C

ADP | IN THE BUSINESS OF YOUR SUCCESS

March 08, 2019

```
||··||||··||··||··||||·····||||||··|||···||·······||||··|·||··||··|||···||·||·||
```
0000077       05 SP 1,600  **SNGLP  T2 2 1067 11223-402261  -C03-P000774
TUN WIN
2261 W 7th Street, BSMT
BROOKLYN, NY 11223-4623

**Re: FMLA Leave Eligibility Notice (Reference Number: C53969323)**

**[Part A – NOTICE OF ELIGIBILITY]**

Dear TUN WIN:

On March 04, 2019 we received notification of your need for block leave beginning on February 11, 2019 for:

Your own serious health condition.

This notice is to inform you that you:

Are eligible for FMLA leave. Please refer to **Part B** for your Rights and Responsibilities while you are out on a leave of absence.

If you have any questions, please contact the ADP TotalSource Leaves Administrator at 866-400-6011.

**[PART B – RIGHTS AND RESPONSIBILITIES FOR TAKING FMLA LEAVE]**

As explained in Part A, you meet the eligibility requirements for taking FMLA leave and still have FMLA leave available in the current rolling 12-month period.However, in order for us

other paid leave during your FMLA absence unless you are receiving disability income (i.e. workers compensation or short-term disability payments) or your worksite employer specifically informs you that it will not require use or substitution of available paid sick, vacation, paid time off or other paid leave. Any paid leave taken for this reason will count against your FMLA leave entitlement. **If you are unable to return to work at the expiration of your leave, you must contact your immediate supervisor and/or submit additional information or you may be deemed to have abandoned your position.**

**If you are participating in employee group health benefits with ADP TotalSource, this paragraph applies to you:** Benefits will be terminated if you are unable to return to work at the end of the above-referenced period of FMLA leave. If benefits are terminated, you will have the option to continue your benefit coverage at your own expense through COBRA. If you are covered under a Union agreement, we suggest that you contact your Worksite Employer to determine how your Collective Bargaining Agreement might affect your benefits termination.

If you have any questions regarding this notice, please do not hesitate to contact the ADP TotalSource Leaves Administrator at 866-400-6011 or by email TotalSource.FMLA@adp.com.

Sincerely,
Maite Martinez
ADP TotalSource Leaves Administration

# EXHIBIT D

**277wel2**

| | |
|---|---|
| **From:** | 277wel2 <277wel2@verizon.net> |
| **Sent:** | Tuesday, April 23, 2019 8:27 AM |
| **To:** | 'Carol Arias' |
| **Subject:** | RE: Status |

Morning Carol and thank you.

**From:** Carol Arias [mailto:Carol@4c.com]
**Sent:** Friday, April 19, 2019 12:39 PM
**To:** 277wel2 <277wel2@verizon.net>
**Subject:** RE: Status

Hi Frank,

Happy Friday ☺
Please see the answers below

**From:** 277wel2 <277wel2@verizon.net>
**Sent:** Thursday, April 18, 2019 9:55 AM
**To:** Carol Arias <Carol@4c.com>
**Subject:** Status

Good Morning Carol,
Please let me know the status of the following people on the March 2019 remittance.

███████████████████████

Tun Win – has been on FMLA and recently resigned
███████████████████████

Thanking you in advance,
Frank 277

# EXHIBIT E



# Teamsters Local 277, Welfare Fund
14 Front Street • Suite # 300
Hempstead, NY 11550
(516) 505-1623



**EMPLOYER TRUSTEES**
JOHN CELAURO
THOMAS DeANGELO
JOHN YANCIGAY

**UNION TRUSTEES**
JASPER BROWN
EDWARD LAWLOR
KEVIN McCAFFREY

4/24/19

Tun Win
1751 Dahill Road #2R
Brooklyn, N.Y. 11223

Dear Member:

We are cancelling your Welfare coverage and your Group Life Insurance effective _____5/79_____ as our records reveal that you have not worked sufficient days during the months of _March + April 2019_ for _YC Roots 4LP._

If you wish to retain your Life or Health Insurance on your own, contact the Welfare Fund Office for further information.

You have 60 days to make this conversion.

If you believe our records are incorrect or if you have worked for another employer, please let us know.

Very truly yours,

Teamsters Local 277
Welfare Fund

# EXHIBIT F

AETNA LIFE INSURANCE COMPANY
P. O. Box 14560
Lexington KY 40512-4560 USA
*000180*J011D04*000337*

| Pay Group: | SIW-ADP Total Source (STD/INS) | Claim No.: | 19727811 |
|---|---|---|---|
| Earnings Begin Date: | 02/18/2019 | Check #: | 3950559 |
| Earnings End Date: | 06/17/2019 | Check Date: | 07/16/2019 |

TUN WIN
2261 WEST 7TH ST BST
BROOKLYN NY 11223

| Employee ID: | xxxxx279 |
|---|---|
| EOB No.: | 27990635 |
| Days Paid: | 85 |

| TAX DATA: | Federal | NY State |
|---|---|---|
| Marital Status: | Single | Single |
| Allowances: | 0 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

## BENEFIT INFORMATION

### —Benefits under Your Plan—

| | |
|---|---|
| Benefit Salary: (amount from which benefits are calculated) | 600.00 |
| Benefit Percentage of Earnings Under Your Plan: | 50% |
| Benefit Amount: | 2210.00 |
| Minimum Benefit Under Your Plan: | 20.00 |
| Maximum Benefit Under Your Plan: | 170.00 |
| Frequency: | WEEKLY |

## BENEFITS BEING PAID FOR THIS PAY PERIOD

## OFFSET INFORMATION

—Offsets applied to your benefit for this pay period—

| Description | Amount | Pay Period | Description | Amount | Pay Period |
|---|---|---|---|---|---|
| Benefit Amount: | 2210.00 | 65 days | | | |

## HOURS AND EARNINGS

## TAXES

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Gross Benefit-Non-Taxable | | | 2,210.00 | | 2,360.00 | | | |
| Total: | | | 2,210.00 | | 2,380.00 | Total: | 0.00 | 0.00 |

## BEFORE-TAX DEDUCTIONS

## AFTER-TAX DEDUCTIONS

## EMPLOYER PAID BENEFITS

| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Total: | 0.00 | 0.00 | Total: | 0.00 | 0.00 | *Taxable | | |

## TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 2,210.00 | 0.00 | 0.00 | 0.00 | 2,210.00 |
| YTD: | 2,380.00 | 0.00 | 0.00 | 0.00 | 2,380.00 |

**COMPANY MESSAGE:** IF YOU HAVE ANY QUESTIONS CONCERNING THIS PAYMENT, PLEASE FEEL FREE TO CONTACT OUR CUSTOMER SERVICE DEPARTMENT AT (888)200-6790.

## NET PAY DISTRIBUTION

| Check #3950559 | 2,210.00 |
|---|---|
| Total: | 2,210.00 |

**AETNA LIFE INSURANCE COMPANY**
P. O. Box 14560
Lexington KY 40512-4560 USA
*001057*J011D04*002182*

TUN WIN
2261 WEST 7TH ST B8T
BROOKLYN NY 11223

| | |
|---|---|
| Pay Group: | SIW-ADP Total Source (STD/INS) |
| Earnings Begin Date: | 05/20/2019 |
| Earnings End Date: | 06/28/2019 |

| | |
|---|---|
| Claim No.: | 19727811 |
| Check #: | 3952733 |
| Check Date: | 07/19/2019 |

| | |
|---|---|
| Employee ID: | 6279 |
| EOB No.: | 28015453 |
| Days Paid: | 25 |

| TAX DATA: | Federal | NY State |
|---|---|---|
| Marital Status: | Single | Single |
| Allowances: | 0 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

## BENEFIT INFORMATION
### —Benefits under Your Plan—

| | |
|---|---|
| Benefit Salary: (amount from which benefits are calculated) | 600.00 |
| Benefit Percentage of Earnings Under Your Plan: | 50% |
| Benefit Amount: | 170.00 |
| Minimum Benefit Under Your Plan: | 20.00 |
| Maximum Benefit Under Your Plan: | 170.00 |
| Frequency: | WEEKLY |

## BENEFITS BEING PAID FOR THIS PAY PERIOD

| Description | Amount | Pay Period |
|---|---|---|
| Benefit Amount: | 170.00 | 5 days |
| | 170.00 | 5 days |
| | 170.00 | 5 days |
| | 170.00 | 5 days |
| | 170.00 | 5 days |

## TAX & OFFSET INFORMATION
### —Offsets applied to your benefit for this pay period—

| Description | Amount | Pay Period |
|---|---|---|
| | | |

## HOURS AND EARNINGS

| Description | Rate | Current Hours | Current Earnings | YTD Hours | YTD Earnings |
|---|---|---|---|---|---|
| Gross Benefit Non-Taxable | | | 850.00 | | 3,230.00 |
| Total: | | | 850.00 | | 3,230.00 |

## TAXES

| Description | Current | YTD |
|---|---|---|
| Total: | 0.00 | 0.00 |

## BEFORE TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Total: | 0.00 | 0.00 |

## AFTER TAX DEDUCTIONS

| Description | Current | YTD |
|---|---|---|
| Total: | 0.00 | 0.00 |

## EMPLOYER PAID BENEFITS

| Description | Current | YTD |
|---|---|---|
| Taxable | | |

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 850.00 | 0.00 | 0.00 | 0.00 | 850.00 |
| YTD: | 3,230.00 | 0.00 | 0.00 | 0.00 | 3,230.00 |

**COMPANY MESSAGE: IF YOU HAVE ANY QUESTIONS CONCERNING THIS PAYMENT, PLEASE FEEL FREE TO CONTACT OUR CUSTOMER SERVICE DEPARTMENT AT (866)200-6790.**

## NET PAY DISTRIBUTION

| | |
|---|---|
| Check #3952733 | 850.00 |
| Total: | 850.00 |



**08/07/2019**
**13001424**
This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check.

**REFER TO MAKER**

[065000090] 08/02/2019
44541162

**AETNA LIFE INSURANCE COMPANY**
P. O. Box 14560
Lexington KY 40512-4560 USA
*000496*J611D04*000489*

| | |
|---|---|
| Pay Group: | SIW-ADP Total Source (STD/INS) |
| Earnings Begin Date: | 06/10/2019 |
| Earnings End Date: | 06/14/2019 |
| Claim No.: | 19727611 |
| Check #: | 3934660 |
| Check Date: | 06/14/2019 |

TUN WIN
2261 WEST 7TH ST BST
BROOKLYN NY 11223

| | |
|---|---|
| Employee ID: | 5279 |
| EOB No.: | 27734495 |
| Days Paid: | 5 |

| TAX DATA: | Federal | NY State |
|---|---|---|
| Marital Status: | Single | Single |
| Allowances: | 0 | 0 |
| Addl. Pct.: | | |
| Addl. Amt.: | | |

## BENEFIT INFORMATION
### ----Benefits under Your Plan----

| | |
|---|---|
| Benefit Salary: (amount from which benefits are calculated) | 600.00 |
| Benefit Percentage of Earnings Under Your Plan: | 50% |
| Benefit Amount: | 170.00 |
| Minimum Benefit Under Your Plan: | 20.00 |
| Maximum Benefit Under Your Plan: | 170.00 |
| Frequency: | WEEKLY |

## BENEFITS BEING PAID FOR THIS PAY PERIOD / OFFSET INFORMATION

| Description | Amount | Pay Period | Description | Amount | Pay Period |
|---|---|---|---|---|---|
| | | | ----Offsets applied to your benefit for this pay period---- | | |
| Benefit Amount | 170.00 | 5 days | | | |

## HOURS AND EARNINGS / TAXES

| Description | Rate | Hours | Current Earnings | YTD Hours | YTD Earnings | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Gross Benefit Non-Taxable | | | 170.00 | | 2,890.00 | | | |
| Total: | | | 170.00 | | 2,890.00 | Total: | 0.00 | 0.00 |

## BEFORE TAX DEDUCTIONS / AFTER TAX DEDUCTIONS / EMPLOYER PAID BENEFITS

| Description | Current | YTD | Description | Current | YTD | Description | Current | YTD |
|---|---|---|---|---|---|---|---|---|
| Total: | 0.00 | 0.00 | Total: | 0.00 | 0.00 | *Taxable | | |

## TOTAL GROSS / FED TAXABLE GROSS / TOTAL TAXES / TOTAL DEDUCTIONS / NET PAY

| | TOTAL GROSS | FED TAXABLE GROSS | TOTAL TAXES | TOTAL DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Current: | 170.00 | 0.00 | 0.00 | 0.00 | 170.00 |
| YTD: | 2,890.00 | 0.00 | 0.00 | 0.00 | 2,890.00 |

**COMPANY MESSAGE:** IF YOU HAVE ANY QUESTIONS CONCERNING THIS PAYMENT, PLEASE FEEL FREE TO CONTACT OUR CUSTOMER SERVICE DEPARTMENT AT (866)200-6790.

## NET PAY DISTRIBUTION

| | |
|---|---|
| Check #3934660 | 170.00 |
| Total: | 170.00 |





# EXHIBIT G

ADP | IN THE BUSINESS OF YOUR SUCCESS

May 03, 2019

Re: FMLA Designation Notice (Reference Number: C53969323)

Dear TUN WIN:

We have reviewed your request for leave under the Family and Medical Leave Act (FMLA) and the supporting documentation that you have submitted. Based on a recent review of your case and or documentation received on April 16, 2019 ADP TotalSource has decided that your FMLA leave request has been approved. All leave taken for this reason will be designated as FMLA leave. The FMLA requires that you notify us as soon as possible if dates of scheduled leave change or are extended, or were initially unknown.

Your FMLA leave will tentatively exhaust on May 06, 2019. If you require additional time beyond May 06, 2019, you will be required to submit updated medical documentation to ADP TotalSource for further review.

If you are taking leave for your own serious health condition, you will be required to present a return to work medical certification to be restored to employment. If such certification is not received in a timely manner, your return to work may be delayed until certification is provided.

You are required to use or substitute your available paid sick, vacation, paid time off or

# EXHIBIT H

**POWER OF ATTORNEY**
**NEW YORK STATUTORY SHORT FORM**

**NYLAG**
NEW YORK LEGAL ASSISTANCE GROUP

**(a) CAUTION TO THE PRINCIPAL:**

Your Power of Attorney is an important document. As the "principal," you give the person whom you choose (your "agent") authority to spend your money and sell or dispose of your property during your lifetime without telling you. You do not lose your authority to act even though you have given your agent similar authority.

When your agent exercises this authority, he or she must act according to any instructions you have provided or, where there are no specific instructions, in your best interest. "Important Information for the Agent" at the end of this document describes your agent's responsibilities.

Your agent can act on your behalf only after signing the Power of Attorney before a notary public.

You can request information from your agent at any time. If you are revoking a prior Power of Attorney, you should provide written notice of the revocation to your prior agent(s) and to any third

parties who may have acted upon it, including the financial institutions where your accounts are located.

You can revoke or terminate your Power of Attorney at any time for any reason as long as you are of sound mind. If you are no longer of sound mind, a court can remove an agent for acting improperly.

Your agent cannot make health care decisions for you. You may execute a "Health Care Proxy" to do this.

The law governing Powers of Attorney is contained in the New York General Obligations Law, Article 5, Title 15. This law is available at a law library, or online through the New York State Senate or Assembly websites, www.senate.state.ny.us or www.assembly.state.ny.us.

If there is anything about this document that you do not understand, you should ask a lawyer of your own to explain it to you.

**(b) DESIGNATION OF AGENT(S):**

I, _Tun Win 2261 West 7th Street, Basement, Brooklyn NY 11223_

_____
name and address of principal

hereby appoint: _Khin San Kyi 2261 West 7th Street, Basement Brooklyn NY 11223_

_____

_____ as my agent
name(s) and address(es) of agent(s)

If you designate more than one agent above, they must act together unless you initial the statement below.

(    ) My agents may act SEPARATELY.

**(c) DESIGNATION OF SUCCESSOR AGENT(S): (OPTIONAL)**

If any agent designated above is unable or unwilling to serve, I appoint as my successor agent(s):

_____

_____

_____

name(s) and address(es) of successor agent(s)

Successor agents designated above must act together unless you initial the statement below.

(     )  My successor agents may act SEPARATELY.

You may provide for specific succession rules in this Section. Insert specific succession provisions here:

_____

_____

_____

_____

_____

**(d)** This POWER OF ATTORNEY shall not be affected by any subsequent incapacity unless I have stated otherwise below, under "Modifications".

**(e)** This POWER OF ATTORNEY DOES NOT REVOKE any Powers of Attorney previously executed by me unless I have stated otherwise below, under "Modifications"

If you do NOT intend to revoke your prior Powers of Attorney, and if you have granted the same authority in this Power of Attorney as you granted to another agent in a prior Power of Attorney, each agent can act separately unless you indicate under "Modifications" that the agents with the same authority are to act together.

**(f) GRANT OF AUTHORITY:**

To grant your agent some or all of the authority below, either
(1) Initial the bracket at each authority you grant, or
(2) Write or type the letters for each authority you grant on the blank line at (P), and initial the bracket at (P). If you initial (P), you do not need to initial the other lines.

I grant authority to my agent(s) with respect to the following subjects as defined in sections 5-1502A through 5-1502N of the New York General Obligations Law:

( ) (A) real estate transactions;

( ) (B) chattel and goods transactions;

( ) (C) bond, share, and commodity transactions;

( ) (D) banking transactions;

( ) (E) business operating transactions;

( ) (F) insurance transactions;

( ) (G) estate transactions;

( ) (H) claims and litigation;

( ) (I) personal and family maintenance. If you grant your agent this authority, it will allow the agent to make gifts that you customarily have made to individuals, including the agent, and charitable organizations. The total amount of all such gifts in any one calendar year cannot exceed five hundred dollars;

( ) (J) benefits from governmental programs or civil or military service;

( ) (K) health care billing and payment matters; records, reports, and statements;

( ) (L) retirement benefit transactions;

( ) (M) tax matters;

( ) (N) all other matters;

( ) (O) full and unqualified authority to my agent(s) to delegate any or all of the foregoing powers to any person or persons whom my agent(s) select;

( ) (P) EACH of the matters identified by the following letters *A,B,C,D,E, F,G,H,I,J,K,L,M,N,O.*

You need not initial the other lines if you initial line (P).

RM. 09-12-10 Rev 8

**(h) CERTAIN GIFT TRANSACTIONS**

**) MODIFICATIONS: (OPTIONAL)**

In this section, you may make additional provisions, including language to limit or supplement authority granted to your agent.

However, you cannot use this Modifications section to grant your agent authority to make gifts or changes to interests in your property. If you wish to grant your agent such authority, you MUST complete the Statutory Gifts Rider.

Initial statements (modifications) that you are inserting:

(      ) This Power of Attorney revokes all other Powers of Attorney signed by me on a prior date.

(      ) This Power of Attorney revokes all other Powers of Attorney signed by me on a prior date **except** for the Power of Attorney signed by me on _____ (insert date).

(      ) This Power of Attorney revokes **only** the Power of Attorney signed by me on _____ (insert date), but no other Powers of Attorney signed by me on a prior date.

(      ) This Power of Attorney revokes previous Powers of Attorney signed by me **except** those for specific limited purposes including management of bank or security accounts.

(      ) In the event that I have two or more Powers of Attorney in effect, my agents are to act in accordance with the terms indicated on each Power of Attorney (together or separately).

(      ) My monitor may request my agents(s) to ........... on pursuant to section (i) of this Power of Attorney no more than _____ (insert a time frame).

(      ) I want my agent(s) to be reasonably compensated. I define reasonable compensation as: $_____ per hour.

(      ) My agent(s) may convey my Co-op apartment Unit #: _____ located at:

Address: _____
         *(Include City, State & Zip)*

(      ) My agent(s) may convey my real property located at:

Address: _____
         *(Include City, State & Zip)*

_____
_____
_____
_____
_____
_____
_____
_____

(i) **CERTAIN GIFT TRANSACTIONS: STATUTORY GIFTS RIDER:** In order to authorize your agent to make gifts in excess of an annual total of $500 for all gifts (under personal and family maintenance), you must initial the statement below and execute a Statutory Gifts Rider at the same time as this instrument. Initialing the statement below by itself does not authorize your agent to make gifts. The preparation of the Statutory Gifts Rider should be supervised by a lawyer.

(      ) (SGR) I grant my agent authority to make gifts in accordance with the terms and conditions of the Statutory Gifts Rider that supplements this Statutory Power of Attorney.

(i) **DESIGNATION OF MONITOR(S): (OPTIONAL)**

If you wish to appoint monitor(s), initial and fill in the section below:

(      ) I wish to designate _____, whose address(es) is (are)_____, as monitor(s). Upon the request of the monitor(s), my agent(s) must provide the monitor(s) with a copy of the power of attorney and a record of all transactions done or made on my behalf. Third parties holding records of such transactions shall provide the records to the monitor(s) upon request.

(j) **COMPENSATION OF AGENT(S): (OPTIONAL)**

Your agent is entitled to be reimbursed from your assets for reasonable expenses incurred on your behalf. If you ALSO wish your agent(s) to be compensated from your assets for services rendered on your behalf, initial the statement below. If you wish to define "reasonable compensation", you may do so above, under "Modifications".

(      ) My agents(s) shall be entitled to reasonable compensation for services rendered.

(k) **ACCEPTANCE BY THIRD PARTIES:** I agree to indemnify the third party for any claims that may arise against the third party because of reliance on this Power of Attorney. I understand that any termination of this Power of Attorney, whether the result of my revocation of the Power of Attorney or otherwise, is not effective as to a third party until the third party has actual notice or knowledge of the termination.

(l) **TERMINATION:** This Power of Attorney continues until I revoke it or it is terminated by my death or other event described in section 5-1511 of the General Obligations Law.

Section 5-1511 of the General Obligations Law describes the manner in which you may revoke your Power of Attorney, and the events which terminate the Power of Attorney.

Eff. 09-12-10 Rev.3

**(■) SIGNATURE AND ACKNOWLEDGMENT:**

In Witness Whereof I have hereunto signed my name on *May 17, 2019.*

*PRINCIPAL signs here:* ➡️  *Tun*

**(acknowledgment)**

STATE OF NEW YORK
COUNTY OF *Kings* ss.:

On *May 17, 2019* before me, the undersigned, personally appeared *Tun Win* personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument the individual executed the instrument.

*A.Babayeva,*

Yuliya Babayeva
Notary Public, State of New York
No. 02BA6305661
Qualified in Kings County
Commission Expires Jun 09 2022

*(Signature and office of person taking acknowledgment)*

**(n) IMPORTANT INFORMATION FOR THE AGENT:**

When you accept the authority granted under this Power of Attorney, a special legal relationship is created between you and the principal. This relationship imposes on you legal responsibilities that continue until you resign or the Power of Attorney is terminated or revoked. You must:

(1) act according to any instructions from the principal, or, where there are no instructions, in the principal's best interest;
(2) avoid conflicts that would impair your ability to act in the principal's best interest;
(3) keep the principal's property separate and distinct from any assets you own or control, unless otherwise permitted by law;
(4) keep a record or all receipts, payments, and transactions conducted for the principal; and
(5) disclose your identity as an agent whenever you act for the principal by writing or printing the principal's name and signing your own name as "agent" in either of the following manners: (Principal's Name) by (Your Signature) as Agent, or (your signature) as Agent for (Principal's Name).

You may not use the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority in this document, which is either a Statutory Gifts Rider attached to a ... Short Form Power of Attorney or a Non-... Power of Attorney.

... that authority, you must act according to ... ations of the principal or, where there are ... instructions, in the principal's best interest. You may resign by giving written notice to the principal and to any co-agent, successor agent, monitor if one has been named in this document, or the principal's guardian if one has been appointed. If there is anything about this document or your responsibilities that you do not understand, you should seek legal advice.

Liability of agent:
The meaning of the authority given to you is defined in New York's General Obligations Law, Article 5, Title 15. If it is found that you have violated the law or acted outside the authority granted to you in the Power of Attorney, you may be liable under the law for your violation.

**(o) AGENT'S SIGNATURE AND ACKNOWLEDGMENT OF APPOINTMENT:**

It is not required that the principal and the agent(s) sign at the same time, nor that multiple agents sign at the same time.

I/we, _Khin San Kyi_ have read the foregoing Power of Attorney. I am/we are the person(s) identified therein as agent(s) for the principal named therein.

I/we acknowledge my/our legal responsibilities.

Agent(s) sign(s) here: ⟹  _____    _____

**(acknowledgment(s))**

STATE OF NEW YORK:
COUNTY OF ____Kings____ ss.:

On _May 17_, 20 _19_ before me, the undersigned, personally appeared _Khin San Kyi_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual executed the instrument.

_____
(Signature and office of person taking acknowledgment)

Yuliya Babayeva
Notary Public, State of New York
No. 02BA6305661
Qualified In Kings County
Commission Expires Jun 09 2022

STATE OF NEW YORK
COUNTY OF_____ ss.:

On_____, 20___ before me, the undersigned, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual executed the instrument.

_____
(Signature and office of person taking acknowledgment)

Eff. 09-12-10 Rev.3

## (p) SUCCESSOR AGENT'S SIGNATURE AND ACKNOWLEDGMENT OF APPOINTMENT:

It is not required that the principal and the SUCCESSOR agent(s), if any, sign at the same time, nor that multiple SUCCESSOR agents sign at the same time. Furthermore, successor agents can not use this Power of Attorney unless the agent(s) designated above is/are unable or unwilling to serve.

I/we,_____,
have read the foregoing Power of Attorney. I am/we are the person(s) identified therein as SUCCESSOR agent(s) for the principal named therein.

Successor Agent(s) sign(s) here: ===>    _____    _____

(acknowledgment(s))

STATE OF NEW YORK
COUNTY OF_____ss.:

On_____, 20___ before me, the undersigned, personally appeared _____
personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument the individual executed the instrument.

_____
(Signature and office of person taking acknowledgment)


STATE OF NEW YORK
COUNTY OF_____ss.:

On_____, 20___ before me, the undersigned, personally appeared _____
personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument the individual executed the instrument.

_____
(Signature and office of person taking acknowledgment)

# EXHIBIT I

**ADP | IN THE BUSINESS OF YOUR SUCCESS**

May 29, 2019



0000395        01 MB 0.425 **AUTO T4 0 1149 11223-482561   -C01-P00395-I

TUN WIN
2261 W 7th Street, BSMT
BROOKLYN, NY 11223-4623

Re: Leave Extension Notice (Reference Number: C53969323)

Dear TUN WIN:

You were granted a leave of absence under FMLA beginning February 11, 2019. The maximum amount of leave under FMLA ended on May 06, 2019. Any and all additional leaves granted (if any) do not fall under FMLA.

4C Foods Corp has approved your request for a leave of absence extension. After the expiration of this leave extension, you are not guaranteed job reinstatement. However, your worksite employer will make reasonable efforts to return you to your position or another vacant one, if available.

You will be required to give status updates of your condition. You must also contact your supervisor one week prior to your return to work to coordinate your return to work. A medical release from your doctor must be submitted prior to or upon your return to work.

Due to the fact that your continued leave does not fall under FMLA, any group health benefits you are currently enrolled in will cease as of May 31, 2019. Please contact your worksite employer if you do not receive group benefits through ADP TotalSource for information pertaining to your group health benefits and COBRA. However, you will have the option of electing COBRA to continue your group health coverage at your own

position, and your employment may be terminated.

Please be advised that if you do not return to work upon expiration of your FMLA leave and have group health benefits, they will be cancelled as of May 31, 2019. If applicable, you will receive COBRA paperwork so that you may elect to continue your benefit coverage at your own expense. Please contact your worksite employer if you do not receive group benefits through ADP TotalSource for information pertaining to your group benefits and COBRA. If you are covered under a Union agreement, we suggest that you contact your Worksite Employer to determine how your Collective Bargaining Agreement might affect your benefits termination.

We look forward to your return to work as scheduled, or to hearing from you in advance should other circumstances be present.

If you have any questions regarding this notice, please do not hesitate to contact the ADP TotalSource Leaves Administrator at 866-400-6011 or by email TotalSource.FMLA@adp.com.

Sincerely,

Maite Martinez
ADP TotalSource Leaves Administration

This fax was received by

# EXHIBIT J

## Statement of Khin Sai Kyi

My name is Khin Sai Kyi and I am the widow of Tun Win. We were married in 2009. We have one child, a 6-year-old daughter named S████ T███-Daw Tw█ born ████████ 2014.

My husband worked for over ten years for 4C Food Corporation and was a member of Local 277 Union. His benefits, including pension, health and life insurance, were provided by the Local 277 Pension Fund. My husband became ill in February of 2019 and was hospitalized at Coney Island Hospital in March of 2019. He returned home only for a few hours and I had to call 911 and he returned to the hospital. He remained there until he was transferred to a long-term care facility, Resort Nursing Home, in November of 2019. He died on April 10, 2020. During much of this period my husband was not able to communicate and did not have the ability to understand. He was 52 when he died. Mr. Win's medical expenses were paid by both his union health insurance and a Health First Medicaid plan.

My husband collected short term disability when he first became ill. He was also approved for leave under the Family Medical and Leave Act. His diagnosis was advanced dementia but I also later learned later he had congestive heart failure. While he was hospitalized, we met with an attorney and he prepared a power of attorney with the attorney's assistance.

In July of 2019 I was told that my husband's illness was terminal. Understanding the seriousness of my husband's illness, I was concerned about his benefits including life insurance through the union fund. I called the Fund first in July of 2019. I spoke with Mr. Asprea and told him my husband was very ill and I was calling about his union benefits. I speak Burmese with some English and there was no interpretation available. He asked for the date of birth of my husband which I gave him and Mr. Asprea told me he is not eligible yet for his pension. He did not provide any other benefit information during this call.

I called a second time at the end of July and spoke to Mr. Asprea and asked for an interpreter. He told me the Fund did not have interpreters.

In October of 2019, one of the social workers at Coney Island Hospital agreed to accompany me to the Fund office. She drove me and we met with Mr. Asprea. He asked me if my husband had died. I told him my husband was totally disabled and had been since February but was still alive. Mr. Asprea told me that he sent a letter to my husband advising him that his life insurance would be cancelled. I explained that we never received any letter. If we had received a letter, we would have immediately followed up as this insurance was very important. He did not tell me about this letter when I called in July.

Mr. Asprea also told me at that time that they were no longer working with this life insurance. I did not know what he meant by this. Mr. Asprea asked for my husband's information again and he told me he would check with the life insurance company and send me a letter but I never heard back.

We received communications about his health coverage at our correct address but Mr. Win and I never received any letter from the Union about the cancellation of his life insurance or other benefits. I know now that a letter was sent to my husband at 1571 Dahill Road in Brooklyn. We lived there until June of 2018 and then moved to West 2nd Street where we resided for 6 months. In January of 2019 we moved to my current address at 2261 West 7th Street, Brooklyn, NY. I do believe the Union and Fund had this address as they were handling my husband's health insurance claims during this period. We also never received any other letters about the termination of Fund benefits.

_____         3/6/2021
Khin Sai Kyi                                             Date
                                                                    4
Translated from English to Burmese on March ,2020

# EXHIBIT K



**Teamsters Local 277 Pension Fund**
14 Front Street • Suite #300
Hempstead, NY 11550
(516) 505-1623



**UNION TRUSTEES**
JASPER BROWN
KEVIN McCAFFREY
THOMAS HOGAN

**EMPLOYER TRUSTEES**
JOHN CELAURO
THOMAS DeANGELO
JOHN YANCIGAY

October 28, 2019

Tun Win
2261 West 7th Street
Brooklyn, NY 11223

RE: Pension Entitlement

Dear Mr. Win:

Please be advised that that our Fund records indicate you have earned 11 vested years from January 2008 through December 2018.

This time will entitle you to a monthly pension benefit at age 65 in the amount of $300 In the year 2033.

If you should die before reaching age 65, your legal spouse will be eligible to collect her portion at that time.

If you have any questions, please contact me at the fund office.

Yours truly,

Fund Manager

F.A/bfg

# EXHIBIT L

This fax was received by GFI FaxMaker fax server. For more information, visit: http://www.gfi.com

# Resort nursing home

430 BEACH 68TH STREET
ARVERNE, N.Y. 11692

March 6, 2020

To Whom It May Concern:

This letter is to confirm that Mr. Tun Win, with dob of 02/14/1968, has been in Resort Nursing Home since 11/20/2019.

His primary care physician is Dr. Mohamed Rahman. Attached is a copy of his medications as requested.

Sincerely,

Mary Joy Sereno
Medicaid Coordinator
Resort Nursing Home
430 Beach 68th Street
Arverne, NY 11692
(718) 474-5200 ext. 2121
mltcdept@resortnh.net

(718) 474-5200 • FAX: (718) 634-7889 • Resortio@aol.com

# EXHIBIT M



March 9, 2020

Teamsters Local 277, Welfare and Pension Fund
Frank Asprea, Fund Manager
14 Front Street, Suite 300
Hempstead, NY 11550

Via fax number (516) 505-1686

Re: Win Tun

Dear Mr. Asprea,

Thank you for taking the time to speak with me on February 26, 2020. As you know, I have been assisting Khin San Khi who is the wife of Tun Win. Mrs. Khi also has a power of attorney for her husband and a copy is attached.

Win Tun was a long time union member who fell critically ill in February of 2019. He was approved for short term disability. According to his wife, after it was determined her husband would not be able to return to work, she reached out to the Union a few times during the summer of 2019 but she speaks Burmese and was advised that a translator could not be provided for her. Khin San Khi has indicated that Win Tun never received anything in writing from Teamsters Local 277 or his employer about the cessation of his benefits and his rights for continuation. This includes the required notice under COBRA about health benefits-it was never received.

Khin San Khi visited the union office in October of 2019 and it was only then that she learned all of Win Tun's benefits had been terminated, without notice, sometime in June. One of our attorneys called with her as well and was advised that the time for Win Tun to convert his life insurance had passed.

I am writing now after having had a chance to review the description of benefits as provided in the Union Summary Plan Description (SPD). In regards to life insurance, the SPD does discuss conversion within 31 days as required by law but there is also, on page 59 (attached) information on "What Happens To Your Life Insurance If You Are Disabled". This section contains no specific deadline or time limit and provides that life insurance will be extended if an employee is and remains totally disabled. It then states to contact the Fund Office. As mentioned above, Khin San Khi contacted the Fund Office a few times but was never provided any information.

There must be a process in place when an employee has a catastrophic illness, such as Win Tun. As you will see from the attached letter, he is now in a nursing home and has no capacity to follow up on these matters. Had his wife received the required notices from Local 277 about his benefits, she would have followed up earlier.

When we spoke, you indicated that you had reached out to the life insurance provider about conversion but we are not asking for conversion; we are asking your offices to extend life insurance coverage for Win Tun according to the Plan provision for total disability. There is no time limit to do so designated in the SPD. Win Tun is the father of a young child, 5 years old, and the life insurance is essential. Given that the member was never given any notice about the termination of his benefits as required by law, we are hopeful your offices may be able to assist this family of this 13 year member of Teamsters Local 277.

I look forward to your reply with an eye toward assisting this family. I also attach an authorization signed by Mrs. Khi as agent for Win Tun.

Very truly yours,


Debra Wolf
Senior Supervising Attorney
LegalHealth
(212) 613-6563

# EXHIBIT N

# SPIVAKLIPTON LLP
### ATTORNEYS AT LAW

Denis P. Duffey Jr.
dduffey@spivaklipton.com
1700 Broadway
New York, NY 10019
T 212.765.2100
F 212.765.8954
spivaklipton.com

August 4, 2020

**VIA UPS OVERNIGHT MAIL**
Debra Wolf, Esq.
Senior Supervising Attorney
New York Legal Assistance Group
7 Hanover Square
New York, NY 10004

Re:   **Teamsters Local 277 Welfare Fund**
**Win Life Insurance claim**

Dear Ms. Wolf:

This firm represents the Teamsters Local 277 Welfare Fund (the "Fund"). I am writing in response to your letter dated March 9, 2020 concerning life insurance benefits for former Fund participant Tun Win (the "Participant") who, according your subsequent communications with the Fund, died in April 2020, and in response to your subsequent communications with the Fund. First, the Fund and its Board of Trustees extend their condolences to the family of the Participant.

### Background

The Fund's life insurance benefit was provided through a group life insurance policy (the "Policy") that can be converted to an individual policy on termination of employment or a disability-based extension of coverage. (Fund Summary Plan Description ("SPD") at 59-60[1].) By letter dated April 24, 2019 to the Participant's address on file at the Fund Office (the "Cancellation Notice"), the Participant was notified that the Fund was cancelling his Welfare coverage and Group Life Insurance Coverage effective May 1, 2019, because the Fund's records revealed that he had not worked sufficient days during March and April 2019 for 4C Foods Corp. (A copy of this letter is enclosed.) The Cancellation Notice further stated that if the Participant wished to retain his Life or Health Insurance on his own, he should contact the Fund Office for further information, and that he had 60 days to make such a conversion.

Thereafter, the Fund ceased providing benefits after June 30, 2019 due to serious cashflow problems and the cessation of employer contributions as of that date. (See enclosed notice.)

---

[1] Excerpts from the SPD containing provisions referenced herein are enclosed.

The Participant did not notify the Fund that he wished to retain his Fund life or health insurance within the 60-day period after their cancellation on May 1, 2019, and thus those benefits were not continued.

Your letter states that the Participant was not given notice of the termination of his benefits. As noted, however, such notice was provided by the Cancellation Notice dated April 24, 2019 that was sent to the address on file for him at the Fund Office.

Your letter further states that the Participant's spouse reached out to the Union a few times during the summer of 2019. The Union, however, is a separate legal entity from the Fund and as stated above, the Fund was not contacted about the Participant during the period after the Cancellation Notice was sent until the Participant's spouse visited the Fund Office in October 2019. By that point, as noted, the time for the Participant to convert his Fund life insurance to a personal policy had passed, and the Fund had ceased providing benefits.

Your letter states that you are not asking for conversion, but for extension of the life insurance coverage for the Participant based on disability. Your letter further states that the Participant became critically ill in February 2019. It also states that he was approved for short term disability, by which we assume you mean to refer to the Social Security disability determination dated September 11, 2019 stating that the Participant had met all the rules to be eligible for Supplemental Security Income based on being disabled as of April 2019.

Following the visit of the Participant's spouse to the Fund Office in October 2019, the Fund Office contacted the insurer to ask whether there was any basis for coverage for the Participant under the Policy. The insurer advised the Fund that the Participant was not eligible for any benefit because he did not timely apply for the conversion of the Policy to an individual policy.

On May 1, 2020, you emailed the Fund Office stating that you wanted to check in so that you could report back to the Participant's widow. This was the first information that the Fund received indicating that the Participant had died. On May 7, 2020, you emailed the Fund office stating that the Participant's date of death was April 10, 2020.

Following receipt of your March 9, 2020 letter, the Fund Office contacted the insurer again to request a review of whether benefits under the Policy could be paid, and forwarded the insurer your letter. On May 15, 2020, the Fund Office forwarded you the insurer's response dated May 13, 2020, stating that a participant must be deemed continuously disabled for any occupation for nine consecutive months in order to be eligible for a waiver of premium. Based on a disability commencing in February 2019, the disability would thus occur for purposes of the Policy in November 2019, as the insurer's response noted. The insurer further noted that the Participant's coverage terminated on May 1, 2019 and that he did not elect the conversion option.

Debra Wolf, Esq.
August 4, 2020
Page 3 of 6

On May 15, 2020, you emailed the Fund office responding to the insurer's May 13, 2020 email. Among other things, your email included the following:

> Is there any way the Union can work with the life insurance to have them make an exception under these circumstances? It would be unfortunate if the family lost out on this needed benefit, especially now.

Insofar as this request occurred after the Participant's death, the Fund shall regard it as a claim for payment of a life insurance benefit under the Plan (the "Claim"). The Fund shall apply the procedures set forth in the SPD starting on page 36 with the section entitled "Manner and Content of Notification of Initial Benefit Determination" and continuing through page 39, with the Claim being treated as a Post-Service Claim for purposes of the section entitled "All Other Post-Service Claims." The other claim and appeal procedures described in the SPD are inapplicable because they concern Health Benefit claims. The Fund considers the 90-day time period for responding to a claim set forth in 29 CFR 2560.503-1(f)(1), the relevant ERISA regulation, to be applicable to the Claim.

## Discussion

Based on our review of the Policy and the information provided, we have concluded that the insurer has correctly identified the reasons why no benefit is payable with respect to the Participant. The Policy provided as follows with respect to the disability extension, in pertinent part:

> If an individual becomes <u>totally disabled as described below</u> by injury or disease <u>while insured</u> and before reaching age 60, his or her Group Life insurance protection will be extended and premiums will be waived. . . .
>
> Notice of initial disability must be given to us within 12 months of the date disability began. An individual is totally disabled if he or she has <u>not received pay for any work for 9 continuous months</u>. . . .

(Policy at 17 (emphasis added); excerpt enclosed.)

Thus as the insurer noted, in order to be eligible for disability extension under the Policy, an individual must be insured under the Policy after the expiration of a continuous 9-month period in which the individual received no pay for any work (and before reaching age 60). Assuming for the sake of argument that the Participant received no pay for any work after February 2019, the earliest month in which he would have been totally disabled within the meaning of the Policy was November 2019. He was not insured as of that date, both because his coverage lapsed on May 1, 2019 and was not converted to an individual policy, and because the Fund ceased providing benefits after June 30, 2019. As a result, he was not entitled to extension of the Policy based on disability.

Your letter states that the SPD describes the disability extension of the Fund life insurance benefit without stating a specific deadline. The SPD also, however, provides that "[t]o the extent that any of the information contained in this SPD is inconsistent with the Trust Agreement establishing the Plan, or applicable collective bargaining, participation, or other agreements (collectively 'official Plan documents'), the official Plan documents will govern in all cases." (SPD cover letter.) The Policy is an agreement constituting an official Plan document within the meaning of this provision, and thus it governs over any arguably inconsistent provision in the SPD.

As noted above, your letter states that the Participant was not given notice of the termination of his benefits. As also noted above, however, such notice was provided by the Cancellation Notice dated April 24, 2019 that was sent to the address on file for him at the Fund Office. The SPD advised participants to notify the Fund if they change their home address. (SPD at 9.) The Cancellation Notice was not returned to the Fund Office as undeliverable and the Fund was not otherwise contacted concerning the Participant until October 2019, when his spouse visited the Fund Office. The Fund thus properly relied on the address on file and reasonably assumed that the Cancellation Notice had been received.

Your May 15, 2020 email to the Fund Office states as follows, referring to the May 13, 2020 response of insurer representative Gabriel Thomas:

Gabe wrote:
- o A member must be deemed continuously disabled for any occupation for nine consecutive months in order to be eligible for Waiver of Premium, which would've been November, 2019.
- o Members have three months to apply for Waiver of Premium after they become eligible, which would've put the application deadline at February,2020.
- o 2 things. What happens when someone like Mr. Tun has a catastrophic illness and they are not able to follow these steps? Do they just lose out?

First, as noted above, the Participant was not eligible for a disability-based waiver of premium in November 2019 because he was not insured at that time, and thus the reference to a February 2020 deadline for applying for such a waiver is immaterial. That the Participant may not have been able to submit such an application due to catastrophic illness (or otherwise) is similarly immaterial; even if he were able to do so, it would not have entitled him to a waiver of premium or continued coverage because he was ineligible for both for the reasons stated above.

Your May 15, 2020 email also states that the Participant's wife "reached out on her own during the summer of 2019 and with one of our attorneys Eric in the fall of 2019 and was never provided this information. Of course, if she was told this, she would have followed through as she had a power of attorney." Your letter stated that the wife's contacts in the summer of 2019 were with the Union. As explained above, the Union is

a separate legal entity from the Fund, and the Fund was not contacted about the Participant until the Participant's spouse visited the Fund Office in October 2019. Even if the Participant's wife had been provided with the referenced information, it would not have entitled the Participant to a waiver of premium or extension of coverage because, again, the Participant was not insured at the earliest time when he could have satisfied the Policy definition of disability, in November 2019.

Your May 15, 2020 email also asks, "Is there any way the Union [by which we assume you mean to refer to the Fund] can work with the life insurance to have them make an exception under these circumstances?" The Fund did not, however, maintain assets for payment of this benefit other than through insurance, and it does not now have any such assets in light of the cessation of the contributions and cashflow problems that led to the cessation of benefits referenced above. Thus paying the benefit based on an exception to the rules applicable under the Policy, as described, is not an available option.

In a May 26, 2020 email to the Fund Office, you stated in part as follows:

Also, according to the notes of our attorney David Mantell who originally met with the member's wife (now widow) and his Nov. 22, 2019 notes indicate:

Spoke with union fund manager. Said that the insurance was through Amalgamated Life but coverage lapsed on May 1. Said they had 60 days from then to convert the coverage and since they did not, have lost it. Said he spoke with insurance company and they said there is nothing that can be done. Asked about him being hospitalized throughout that time and he said that since she had POA, still needed to do it by then.

This differs from the information now provided and we are hoping for a fair resolution for Mr. Tun's widow and child.

The referenced information does not, however, differ materially from the information previously provided, and in any event it does not change the analysis and conclusions set forth above.

For the foregoing reasons, the Claim is denied.

You (i.e., the claimant or you as representative of the claimant) have the right to appeal this denial of the Claim by written request to the Board of Trustees within 180 days of the date of your receipt of this letter. You may submit written comments, documents, and other information relating to the claim within that 180-day period. *In calculating this 180-day period, however, the "Outbreak Period" as determined under applicable regulations shall be disregarded. The Outbreak Period is defined as the period from March 1, 2020 until 60 days after the COVID National Emergency declared by the President ends as determined by the federal government (or such other date as*

Debra Wolf, Esq.
August 4, 2020
Page 6 of 6

*the Department of Labor and Internal Revenue Service announce, which may be specific to different states or geographic regions).  For example, if the National Emergency had ended on June 29, then the Outbreak Period would end on August 28 (60 days later), and the period from March 1 through August 28 would not count against the deadline for you to appeal. The deadline to appeal would begin to run on August 29 in those circumstances.*

In addition, you have the right to review, free of charge, documents relevant to your claim.  A document, record or other information is relevant if it was relied upon by the Plan in making its decision; if it was submitted, considered or generated in connection with your claim (regardless of whether it was relied upon); if it demonstrates compliance with the Plan's administrative processes for ensuring consistent decision-making; or if it constitutes a statement of Plan policy regarding the denied treatment or service.

Your claim will be reviewed by the Board of Trustees, which is not subordinate to (and shall not afford any deference to) the person who originally made the adverse benefit determination.  The Board's decision will be made on the basis of the record, including such additional documents and comments that may be submitted by you.

A decision on an appeal will ordinarily be made at the next regularly scheduled meeting of the Board of Trustees following receipt of your appeal.  However, if your appeal is received within 30 days of the next regularly scheduled meeting, your appeal will be considered at the second regularly scheduled meeting following receipt of your appeal. In special circumstances, a delay until the third regularly scheduled meeting following receipt of your appeal may be necessary. You will be advised in writing in advance if this extension will be necessary. Once a decision on your appeal has been reached, you will be notified of the decision as soon as possible, but no later than five days after the decision has been reached.

If your appeal is denied, you have the right to bring a civil action under ERISA § 502(a).

Very truly yours,

Denis P. Duffey Jr.

Enclosures

cc:    (via encrypted email)
       Frank Asprea, Fund Administrator
       Eric R. Greene

# EXHIBIT O



September 29, 2020

Denis P. Duffy, Jr. Esq.
SpivakLipton LLP
1700 Broadway
New York, NY 10009

Via secure email

Re: Khin San Kyi Life Insurance Proceeds Claim

Dear Mr. Duffy,

As you know, the New York Legal Assistance Group has been assisting Mrs. Khin San Kyi (hereinafter Claimant), the widow of former Teamsters Local 277 Welfare Fund Participant, Tun Win (hereinafter Participant). Mrs. Kyi is the beneficiary of the life insurance policy help by Amalgamated Life Insurance. We have received your letter dated August 4, 2020 denying her claim for the life insurance proceeds.

According to the information we received from Fund Manager Frank Asprea after he reached out to Amalgamated Life Insurance, in his email to me dated May 15, 2020, the Participant would have had up until February 2020 to request continued coverage:
> "If the member was disabled and the policy was still in force, he would have had until Feb 2020 to file for continued coverage under the Waiver of Premium provision."

We understand about the termination of Fund benefits in June 2019 but notice was not given to Participant, who was disabled at the time, in order to allow him to protect his rights. Further, the notice of cancellation sent in April of 2019 was sent to a prior address of Participant. Upon information and belief, other notices regarding his health coverage were sent to the correct and then current address of Participant.

The Claimant has requested that our office assist her in obtaining the administrative claim file documents on her behalf and pursuant to her rights under ERISA. Once received and reviewed, she will then make a determination about filing an appeal. We are therefore requesting that you please forward to me the following documents:

1. a copy of the full Fund Summary Plan Description;
2. all file documents pertinent to the claim denial including but not limited to case notes, medical records and reports and employment records of Participant; meeting logs and all communications including telephone logs. Please include:
   - all written correspondence and communications between The Fund or Fund Manager Mr. Frank Asprea and Participant dated between January 1, 2018 to present;
   - all written correspondence and communications between The Fund or Fund Manager Mr. Frank Asprea and Claimant dated between January 1, 2018 to

present;
- all written correspondence and communications between The Fund, Fund Manager Mr. Frank Asprea and Teamsters Local 77 (The Union) regarding Participant and/or or Claimant dated between January 1, 2018 to present;
- All file documents and log notes pertaining to the visit of Claimant to the Fund Office in October of 2020 as well as any other visits from January 2019 to present.

**3.** all documents pertaining to Claimant's application for Short Term Disability benefits with either the Union or the Fund;

**4.** all documents referred to on Page 4 of the letter dated August 4, 2020 denying the life insurance benefit to Claimant as "collectively official Plan documents" which include The Trust Agreement establishing the Plan, or applicable collective bargaining, participation or other agreements;

**5.** all Fund or other documents outlining any agreements between The Fund and/or The Union with Road Carriers Local 707 Welfare Fund regarding the transfer or carry over of employee benefits including existing claims that existed or were pending in June of 2019 and thereafter when The Fund ceased providing benefits as outlined in the Summary of Material Modification dated June 19, 2019.

Thank you in advance for your cooperation and consideration.

Very truly yours,

S/Debra J. Wolf

Debra J. Wolf
Senior Supervising Attorney
LegalHealth, NYLAG
7 Hanover Square, 18th Fl
NY, NY 10004
Ph: (212) 613-5082 (voicemail only)
     (917) 765-6244 (temporary number)
Fax: (212) 714-7508
dwolf@nylag.org

# EXHIBIT P



# SPIVAKLIPTONLLP

ATTORNEYS AT LAW

1700 Broadway
New York, NY 10019
T 212.765.2100
F 212.765.8854
spivaklipton.com



November 2, 2020

**BY UPS OVERNIGHT MAIL**
Debra J. Wolf, Esq.
Senior Supervising Attorney
LegalHealth, NYLAG
7 Hanover Square, 18th Floor
New York, NY 10004

Re:    277 Welfare Fund--Life Insurance Benefit Claim

Dear Debra,

As you know, this firm represents the Teamsters Local 277 Welfare Fund ("the Fund") with respect to the Fund's denial of the claim by Khin San Khi ("the Claimant") for payment of a life insurance benefit under the Fund's Plan of benefits ("the Plan") through a group life insurance policy (the "Policy") as result of the death of her spouse, Tun Win (the "Participant"), who had been a participant in the Fund.

The Fund's responses to the document requests contained in your letter dated September 29, 2020, are as follows:

Request 1:    *a copy of the full Fund Summary Plan Description*

Response to Request 1:

The Fund Summary Plan Description is enclosed as Attachment A.

# SPIVAKLIPTONLLP
### ATTORNEYS AT LAW

**Request 2:**  all file documents pertinent to the claim denial including but not limited to case notes, medical records and reports and employment records of Participant; meeting logs and all communications including telephone logs.

Please include:

- all written correspondence and communications between The Fund or Fund Manager Mr. Frank Asprea and Participant dated between January 1, 2018 to present;

- all written correspondence and communications between The Fund or Fund Manager Mr. Frank Asprea and Claimant dated between January 1, 2018 to present;

- all written correspondence and communications between The Fund, Fund Manager Mr. Frank Asprea and Teamsters Local 77 [sic] (The Union) regarding Participant and/or Claimant dated between January 1, 2018 to present;

- All file documents and log notes pertaining to the visit of Claimant to the Fund Office in October of 2020 [sic] as well as any other visits from January 2019 to present.

**Response to Request 2:**

ERISA regulations provide that in the course of a plan's appeals procedure, a claimant is entitled to "relevant" documents, records, or information.

**SPIVAKLIPTON**LLP
ATTORNEYS AT LAW

29 CFR 2560.503-1(h)(2)(iii).  The regulations further provide that a document, record, or information shall be considered "relevant" to a claim if it:

(i) Was relied upon in making the benefit determination;

(ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;

(iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or

(iv) In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.,

29 CFR 2560.503-1(m)(8).

The Fund's letter to you dated August 4, 2020 stating that no benefits were payable (the "Denial Letter") sets forth the reasons for that determination and notes the documents considered in making that determination.  As indicated in the Denial Letter, the determination was premised on relevant language of the SPD and the Policy, and the cancellation of the Participant's coverage under the Policy due insufficient work with a contributing employer.

Accordingly, the following relevant documents responsive to Request 2 are enclosed herewith:

1. The Policy, enclosed as Attachment B.

2. The Employers Monthly Contribution Reports for February and March 2019, which were relied upon in determining the time at which the

**SPIVAK LIPTON LLP**
ATTORNEYS AT LAW

Participant's coverage under the Policy was cancelled based on a reduction in his employment by his employer. These documents are enclosed as Attachment C. They indicate that the Participant worked for his contributing employer for 15 days in February 2019 and 10 days in March 2019, totaling less than 26 days in that two-month period and triggering termination of his coverage. (See SPD at 11.) The Fund received the March 2019 report in mid-April 2019, and after checking with the employer concerning the Participant's status, was advised that he had recently resigned. (See next item.) The Fund accordingly notified the Participant by letter dated April 24, 2019 that his coverage was terminated effective May 1, 2019. As you know, a copy of that notice was provided with the Denial Letter.

3. Email correspondence between the Fund and the Participant's employer dated April 18-23 in which the employer informed the Fund that the Participant had recently resigned, as noted above. This document is enclosed as Attachment D.

Your request for "case notes [and] medical records and reports . . . of Participant" does not seek relevant information because, as indicated in the Denial Letter, no such material was relied upon in making the determination and

Ms. Debra Wolf, Esq.
November 2, 2020
Page 5 of 7

# SPIVAKLIPTONLLP
ATTORNEYS AT LAW

such information is not otherwise relevant under the referenced ERISA

regulations.[1]

With regard to the remainder of Request 2, the Fund has no responsive

documents.

<u>Request 3</u>:    all documents pertaining to Claimant's application for Short Term

Disability benefits with either the Union or the Fund


<u>Response to Request 3</u>:

The Fund did not provide Short Term Disability Benefits and no application

therefore was made to the Fund by the Claimant or Participant.  The Fund has no

records responsive to this request.  As to the request for documents pertaining to

an application for such benefits to the Union (by which we understand you to

mean Teamsters Local 707), please note that the Fund is a separate legal entity

from the Union and has no authority or obligation to provide documents

responsive to that request.


<u>Request 4</u>:    all documents referred to on Page 4 of the letter dated August 4,

2020 denying the life insurance benefit to Claimant as "collectively official Plan

documents" which include The Trust Agreement establishing the Plan, or

applicable collective bargaining, participation or other agreements

---

[1] See, e.g., <u>Fisher v. Harvard Pilgrim Health Care</u>, 2018 U.S. Dist. LEXIS 116751 at 8
(D. Mass. 2018) (finding that treatment notes and other communications not considered
by the plan in its eligibility determination were not relevant under 29 CFR 2560.503-
1(m)(8)).

Ms. Debra Wolf, Esq.
November 2, 2020
Page 6 of 7

# SPIVAKLIPTON LLP
ATTORNEYS AT LAW

**Response to Request 4:**

The only relevant responsive to this Request are the Summary Plan Description and the Policy, which are enclosed as stated above. Additionally, although not among the documents relied on making the determination as described in the Denial Letter, the Trust Agreement and collective bargaining agreement applicable to the Participant during the relevant period are enclosed as Attachments E and F, respectively, pursuant to Claimant's entitlement to such documents under 29 USCS § 1024(b)(4).

**Request 5:**  all Fund or other documents outlining any agreements between The Fund and/or The Union with Road Carriers Local 707 Welfare Fund regarding the transfer or carry over of employee benefits including existing claims that existed or were pending in June of 2019 and thereafter when The Fund ceased providing benefits as outlined in the Summary of Material Modification dated June 19, 2019

**Response to Request 5:**

The Fund objects to this request because it is overly broad and irrelevant to the Claim and, with respect to the request for documents other than Fund documents, because it seeks information outside the Fund's control or its authority to produce.

Thank you.

**SPIVAK LIPTON**LLP
ATTORNEYS AT LAW

Very truly yours,

Denis P. Duffey Jr.

# EXHIBIT Q



**NYLAG**
New York ████ Legal Assistance Group

March 8, 2021

Denis P. Duffy, Jr.. Esq.

Spivak Lipton

1700 Broadway

New York, NY 10019

Via email at dduffy@spivaklipton.com

Re:  Tun Win Life Insurance Claim with Teamsters Local 277 Welfare Fund

Dear Mr. Duffy,

As you know, the New York Legal Assistance group (NYLAG) represents Khin Sai Kyi, the widow of Tun Win.  This appeal is regarding the denial of life insurance benefits to Mrs. Kai, his widow, for the reasons set forth below.

**Factual Background:**

Tun Win was employed for eleven years by 4C Food Corporation (4C Food Corp) and was a member of Local 277.  His benefits which included health and life insurance, as well as his pension, were provided and administered by the Local 277 Welfare Fund (hereinafter The Fund).

He and his wife (now widow) Khin Sai Kyi (Claimant) resided in Brooklyn, NY.  They have one child, a six-year-old daughter.  Claimant speaks Burmese with limited English. Mr. Win and Claimant resided together at 2261 West 7th Street, Basement, Brooklyn, NY since January of 2019. Attached as **Exhibit A is a st**atement of Claimant Khin Sai Kyi (prepared with the assistance of a Burmese interpreter who provided who also read the statement in full to Claimant in Burmese before signing).  Prior to the current address, the family lived for six months, from June through December of 2019, on West 2nd Street in Brooklyn.  Prior to that and until June of 2018, they resided at 1571 Dahill Road in Brooklyn

Mr. Win fell ill in February of 2019 and was hospitalized at Coney Island Hospital in March of 2019. In May, while still hospitalized, Mr. Win executed a Power of Attorney appointing Claimant as his agent. **(See Ex. D)**. The Power of Attorney was prepared bedside by an attorney with the New York Legal Assistance Group's LegalHealth division, a medical-legal partnership, which conducts a legal clinic at Coney Island Hospital for their patients and family.

Mr. Win's medical documents are attached here to as **Exhibit B**. He never regained his health or ability to return home. He was transferred to a long-term care facility on November 20, 2019 where he remained until his death on April 10, 2020 (see letter from Resort Nursing Home, **Ex B**). The documents in **Exhibit B** show his diagnoses of progressive early onset dementia with hallucinations and major neurocognitive disorder with severe memory loss.

Mr. Win was approved for New York State short term disability which he collected **(Ex. B)**. He was also approved by 4C Food Corp for leave under the Family Medical and Leave Act of 1993 (FMLA) through May 6, 2019 **(Exhibit C)**. After May 6, 2019, Mr. Win was approved for a leave of absence extension by 4C Food Corp **(Ex. C)**, however he was never able to return to work.

This appeal challenges the denial of Mr. Win's life insurance policy to Claimant, his wife. After a number of attempts by Claimant to obtain information discussed more fully below, NYLAG sent a letter dated March 9, 2020 to the Fund Manager, Mr. Frank Asprea. That letter with documents is attached as **Ex. D**. We received in response the denial letter dated August 4, 2020 and attached as **Ex. E** containing documents not seen before by Claimant. Referenced hereto as **Ex. F** is the request for documents relied upon in making this determination as well as the November 2, 2020 response from the Plan's counsel. The documents (hereinafter referred to as "Documents") included with this response are not attached hereto due to their volume but are made a part of and incorporated into this appeal. These documents include the Summary Plan Description (SPD) of Benefits, the

2

Life Insurance Policy with Amalgamated Life Insurance (The Policy), communications between the Plan and Mr. Win's employer and the Fund Agreement and Declaration of Trust. The Union contract was also included in the Documents.

**The Plan:**

Claimant had in her possession the Summary Plan Description (SPD) of Benefits through The Fund.

The SPD on page 6 provides: "Naturally, the hope is that serious illness or injury never comes your way. However, as a participant of the Teamsters Local 277 Welfare Fund, you and your family have protection against such costs through a wide range of coverage."

Moving specifically to life insurance benefits, information in the SPD begins on page 58. Given his years of work and Fund membership, Mr. Win was insured for $10,000. Page 59 of the SPD addresses "What Happens To Your Life Insurance If You Are Disabled". The SPD specifically states as follows:

> If you become disabled while you are working in covered employment before you reach age 60, but after the effective date of your insurance, the full amount of your life insurance protection **will be extended** (emphasis added). To qualify for this extended life insurance during a disability, your disability must prevent you from engaging in any occupation for compensation or profit.

> Your protection will be extended up to the first anniversary of the date premium payments stop so long as you remain totally disabled. If proof of your continued total disability is submitted to the office three months before each anniversary date that premium payments stop, your life insurance protection may be extended further....

> If you die, your beneficiary must provide proof to the Fund within one year that your total disability continued to the date of your death.

> This protection will be discontinued when you are no longer disabled, fail to submit to an examination, or fail to furnish required proof. If your insurance protection is discontinued, you have the right to convert your Group Life Insurance to an Individual Life Insurance policy. Contact the Fund office for forms to file proof of your total disability. (SPD Page 59).

3

Attachment B of the Documents was the Life Insurance Policy provided by Amalgamated Life Insurance Company (The Policy). The Policy discusses on page 16 conversion rights when the employee terminates their employment. The time limit specifically set forth for conversion in the Policy is 31 days if the employee is notified within 15 days of the change in life insurance of their right to convert. That conversion time period is extended to 90 days after the change in life insurance status if notice is not given. (Policy, p. 16).

The Policy also specifically discusses "Total Disability Before Age 60" in Part 3, page 17. This expands on the language set forth in the SPD and states: "If an individual becomes totally disabled as described below by injury or disease while insured and before reaching age 60, his or her Group Life insurance protection **will be extended and premiums will be waived**" (emphasis added). It goes on to state that this protection will continue for up to one year from the date of disability and can then be renewed if proof of disability is provided. The Policy provides that "Notice of initial disability must be given to us within 12 months of the date disability began."

In the Policy, Total Disability is defined as "the Individual under the age of sixty (60) is wholly and continuously disabled and prevented from engaging in each and every occupation and employment for compensation and profit for which he or she is reasonable qualified in education, training and experience" (Policy, p. 7.) This mirrors the definition in the SPD above. As noted in Exhibit A, other than for a few short hours, Mr. Win remained hospitalized (or in a long-term care facility) from March of 2019 until his death in April of 2020.

The Policy also provides that "If the group policy is terminated, the disabled individual **will have the right to convert to an individual policy**." (emphasis added) (The Policy, p. 17).

4

**Communications:**

Beginning in July of 2019, Claimant sought to obtain information about her husband's insurance benefits from the Fund Manager, Mr. Asprea, on a number of occasions. As set forth in her statement, she learned in July of 2019 that her husband's life expectancy was less than six months. Recognizing the seriousness of his medical condition Claimant understood the importance of securing his life benefit for herself and her minor child after he passed. She called the Fund Manager in July of 2019 to ask about the life insurance (**Ex. A**). She spoke with Mr. Asprea. She was able to communicate that her husband was ill and she was calling about the life insurance and Mr. Asprea was able to look up Mr. Win's information. He explained about the pension but gave Claimant no other information. Due to the language barrier and the unavailability of a translator, the conversation ended. According to Claimant, she called again later in in July of 2019 and asked for a translator which Mr. Asprea told her he could not provide. After she was unable to obtain information by telephone due to the language barrier and inability of the Fund Manager to provide a translator, Claimant, in October of 2019, went to the Fund office located at 14 Front Street in Hempstead, NY. She was accompanied by a Social Worker from Coney Island Hospital where Mr. Win was still hospitalized. They met with Mr. Asprea who told them at that time that the time to convert had passed and a letter had been sent to them, and that the policy was no longer available but, according to Claimant, Mr. Asprea told her he would contact the life insurance company on her behalf. She never heard further.

Claimant returned to the NYLAG Coney Island Hospital legal clinic on November 22, 2019 where she met with another LegalHealth attorney, David Mantell. Mr. Mantell then left NYLAG for another position. On February 26, 2020, Claimant met with Attorney Debra Wolf, who called the Fund Manager, Mr. Frank Asprea with Claimant present.

NYLAG then wrote a letter to Mr. Asprea in order to explain that we were requesting information about the disability extension. At this time, I was not aware that the Fund had discontinued the Policy in June of 2019. I also incorrectly referred to the Fund and Fund

office as the Union as it was the Fund Claimant reached out to in the discussion below. Upon information and belief, the fact that the Policy had been terminated was not communicated to Mr. Mantell as it was not in his notes nor had I been told this during my call to Mr. Asprea on February 26. After receiving no reply, I had email correspondence with Mr. Asprea to follow up as, by this time, many offices including NYLAG were closed due to the COVID pandemic.

After back and forth communications to follow up, I received the following information from Mr. Asprea by email dated May 15, 2020:

> Good Morning Debra, hope you are well.
> Attached is the respond I received form Amalgamated Life regarding the case we have been looking into. Please get back to me with any questions or if I could be of any assistance.
> Thank you,
> Frank 277
> **From:** Thomas, Gabriel [mailto:gthomas@amalgamatedlife.com]
> **Sent:** Wednesday, May 13, 2020 12:57 PM
> **To:** 277wel2 <277wel2@verizon.net>
> **Subject:** RE: Disability T.W.
>
> Hi Frank, hope you are well. Here are the facts of the situation as we have compiled them:
>
> - Member went out on disability while he was a covered employee in February 2019.
> - Member did not apply for continuation of coverage under the Waiver of Premium Benefit on Disability before age 60.
> - Member's coverage termed with the Fund on May 1, 2019 and he did not elect the conversion option.
> - The Fund terminated its policy (260C21) on July 1, 2019.
> - Member passed on April 10, 2020.
> - Per our Policy Services Department, policy 260C21 did not include an extension of coverage provision.
>
> Based on the above, our Claims Department has made the following determinations:

- If the member was disabled and the policy was still in force, he would have had until Feb 2020 to file for continued coverage under the Waiver of Premium provision.
  - A member must be deemed continuously disabled for any occupation for nine consecutive months in order to be eligible for Waiver of Premium, which would've been November, 2019.
  - Members have three months to apply for Waiver of Premium after they become eligible, which would've put the application deadline at February, 2020.
- When the plan terminated on July 1, 2019, the member's group coverage was already terminated by the Fund on May 1, 2019, so he would not have been eligible to convert his policy at that time.

If you have any questions, please don't hesitate to let me know.

All the best,

Gabe

I followed up by email and then received the attached denial letter dated August 4, 2020 from counsel for the Fund, Spivak Lipton, formally denying Claimant's request for the proceeds of the life insurance of her deceased husband. **(Ex. E).** This letter contained certain documents never before seen by Claimant. **(See Ex. A, statement of Claimant, Mrs. Kyi).**

These documents include:
- Letter dated April 24, 20919 and addressed to Tun Win at 1751 Dahill Road, #2R, Brooklyn, NY 11223. The letter was to advise Mr. Win that due to his lack of work, his Fund benefits would be cancelled on May 1, 2019 and he had 60 days to convert. As noted in the affidavit of Claimant, she and her husband had not resided at this address since June of 2018 and this letter was never received by them. It is important to note that on May 1, 2019, Mr. Win was still covered under FMLA protections. The Plan states that all coverage will be maintained during FMLA (SPD, page 12). This cancellation was thus in in violation of both the terms of the Plan as well as Mr. Win's rights under FMLA.

- Also attached in **Exhibit E** was a Notice dated June 19, 2019 notifying Welfare Fund participants that all benefits were discontinued effective June 30, 2019 due to "serious cash flow problems facing the Fund…" This notice was not received by Mr. Win or Claimant. Upon information and belief, it was not sent to them as the Fund had discontinued his benefits as of May 1, 2019 (in violation of his rights under FMLA and the Plan).

**ARGUMENT:**

This appeal contends that the denial of life insurance proceeds to Claimant is erroneous for a number of reasons. This is based on the lack of any notice as a result of the incorrect actions of the Fund Manager as well as the lack of response to Claimant's inquiries on behalf of her husband and herself. It is important to note that at the time the letter was sent by NYLAG in March 9 (**Ex. D**) neither Claimant nor our office was aware that the Fund had terminated this life insurance plan at the end of June of 2019. This information was not provided by Mr. Asprea during our telephone conversation. Our theory then was that Mr. Win was entitled to the Fund insurance policy extension as a disabled person as set forth in the SPD. With this new information, we must also look to the Plan conversion rights both as a disabled person and, in the alternative, at the expiration of Mr. Win's FMLA.

Claimant contends that the notice mailed to Mr. Win terminating his benefits and the subsequent termination of benefits as of May 1, 2019 must be disregarded as it was not only addressed incorrectly but it also violated both his rights under FMLA and the Plan.

Incorrect address:

As discussed above, this letter dated April 24, 2019 was addressed to Tun Win at 1751 Dahill Road, #2R, Brooklyn, NY 11223. The letter was to advise Mr. Win that due to his lack of work, his Fund benefits would be cancelled on May 1, 2019 and he had 60 days to convert. As noted in the affidavit of Claimant (**Ex. A**), she and her husband had not

8

resided at this address since June of 2018 and this letter was never received by them.  Mr. Win was hospitalized continuously from March 2019 until he was moved to a long term care facility.

Upon information and belief, his medical bills while hospitalized were paid in part by the Fund Plan.  The SPD indicates on the cover page (attached hereto as **Ex. G**) that Alicare is the third party administrator for medical claims.  Also attached in **Exhibit G** is a letter from Alicare to Mr. Win, dated May 8, 2019, just two weeks after the April 24th letter, correctly addressed to Mr. Win's current and correct address. The medical and life insurance benefits are included in one Plan.  It is thus clear that the Fund had the correct address for medical benefits and the letter sent to Dahill Road was an error and an oversight by the Fund Manager.

FMLA:

The Fund Manager had notice that Mr. Win was covered under FMLA.  Included in the Documents (**Exhibit E**) provided was an email from Mr. Win's employer to Mr. Asprea dated April 23, 2019 indicating that Mr. Win "has been on FMLA and recently resigned." Mr. Asprea's response was simply "Morning Carol and thank you" with no follow up regarding the terms of Mr. Win's FMLA leave.  (**Exhibit H**).  This violated the Fund Manager's duty as a fiduciary (see below) for Mr. Win to assess his right to maintain coverage during his medical leave as well as his duty to inquire further on behalf of Mr. Win.  The information relayed was correct in part (has been on FMLA) and incorrect in part (recently resigned) as the documents in **Exhibit C** show that Mr. Win was granted an extended leave of absence.

The Fund Manager's purported cancellation of Mr. Win's benefits as of May 1, 2019, which violated both FMLA and his rights under the Plan to continue his benefits (SPD p. 12) should be determined to be ineffective.  Mr. Win was never provided notice that all Fund benefits would be terminated as of June 30th, 2019.  Had they received this notice,

Claimant would have followed up. In fact, even without this notice she made efforts to follow up as set forth in her affidavit (**Ex. A**).

**First Conversion Right:**

The Policy discusses on page 16 conversion rights when the employee terminates their employment. The time limit specifically set forth for conversion in the Policy is 31 days if the employee is notified within 15 days of the change in life insurance of their right to convert. That time period is extended to 90 days after the change of life insurance status if notice is not given. (Policy, p. 16).

Mr. Win should have been granted the opportunity to convert when his benefits would have been correctly terminated at the end of his FMLA leave (see letter from employer extending his leave of absence, **Ex. C**). When Claimant reached out to Mr. Asprea in July of 2019 on behalf of her husband, he was still within the 90 day time limit to convert (as no notice was received) but no information was provided and she was incorrectly told it was past the deadline. Even with the language barrier, she told him she was calling about the life insurance and understood when he told her the deadline had passed. This was the information provided to Attorney David Mantell when he called according to his notes (as well to me when I reached out as discussed below).

Mr. Mantell's notes from November 22, 2019 about the conversation read as follows:

> He's been working at company, 4C Food Corp, for a little over 11 years. Got sick in February and been hospitalized since then. Insurance through work. Part of Teamsters Local 277. Spoke with wife Khin San Kyi. Is concerned about receiving life insurance/disability for husband. Spoke with union fund manager. Said that the insurance was through Amalgamated Life but coverage lapsed on May 1. Said they had 60 days from then to convert the coverage and since they did not, have lost it. Said he spoke with insurance company and they said there is nothing that can be done. Asked about him being hospitalized throughout that time and he said that since she had POA, still needed to do it by then. Also communicated that his pension will not vest until 2023,

which I communicated to her. Wife says they did not receive any letter notice about need to convert life/disability insurance. Went to union in October and no one communicated anything to her.

Even if we accepted that the May 1 termination of benefits was correct (we do not), since notice was given improperly due to the incorrect address, Mr. Win would have had 90 days to convert, until August 1, 2019. Members are directed by the SPD to call the Fund Office. As discussed above, Claimant called Mr. Aspra in July, within the allowed time to convert.

Claimant continued to follow up and visited the Fund Office in October of 2019. Given the seriousness of her husband's illness, she would have taken any necessary steps to continue his life insurance to provide for herself and their young child had the correct information been provided.

Claimant continued her inquiry and on her behalf and with Claimant present, I called Mr. Aspra on February 22, 2020. My notes from that conversation read in part:

I called union, Mr. Aspra, he knew who I was calling about and said I was the 4th or 5th person, told me too late to convert and had 31 days, I explained that the booklet says the life insurance will be extended if disabled and no deadlines or time, not a conversion but an extension...

No further information was provided during that call as, according to my notes, Mr. Aspra expressed anger over the number of calls.

The letter to Participants dated June 19, 2019 advising them that benefits would be discontinued effective June 30. 2019 was, upon information and belief, not sent to Mr. Win. Given that the first letter with conversion notice dated April 24, 2019 was ineffective for the two reasons stated (FMLA protection and incorrect address) Mr. Win had no notice of his right to convert and, according to the SPD, was advised that his life insurance would continue during his period of disability.

11

**2nd Conversion Right as at Termination of Policy and as a Disabled Person:**

According to the SPD page 59: "If you become disabled while you are working in covered employment before you reach age 60, but after the effective date of your insurance, the full amount of your life insurance protection will be extended."

The Policy Part 3, discusses "Total Disability Before Age Sixty". Although not in the SPD, the Policy states that "if the group policy is terminated, the disabled individual will have the right to convert to an individual policy." (Policy, p. 17) No time limits are given.

Upon information and belief, the June 19, 2019 letter notifying Welfare Fund participants that all benefits were discontinued effective June 30, 2019 due to "serious cash flow problems facing the Fund…" was not sent to Mr. Win because his Fund benefits were terminated by the Plan, albeit erroneously, on May 1, 2019. As such, this notice was not received by Mr. Win or Claimant.

Mr. Win clearly would have had the right, at the discontinuance of the Amalgamated Policy, to then convert to an individual policy under the Policy provisions protecting his rights as a disabled person. Had he been notified and allowed to convert as was his right under the Plan and Policy, he would have continued to be covered and qualify for the Policy waiver of premium. This failure to provide the required notice and his right to convert as a disabled person deprived Mr. Win of his life insurance protections and Claimant, his widow, of the benefit upon his death on April, 10, 2020. These are benefits Mr. Win had contributed to for many years through his union dues and at the time of his critical illness, despite assurances in the SPD that he would be protected and despite the many requests for information and assistance by Claimant which were unmet by the Fund Manager.

As set forth above, despite the attempts for information specifically about life insurance by Claimant, the Fund Manager never provided information about this right to convert as,

12

upon information and belief, the Fund Manager relied on the ineffective termination of Mr. Win's benefits on May 1, 2019.

The Fund argues in their denial letter (**Ex. E**) that Mr. Win was not considered totally disabled until he met the required nine-month period, and by that time the Union had terminated the life and health benefit. The Policy has contradictory definitions of "Total Disability." Requiring a member to wait nine months while unable to work in any capacity due to their illness, contradicts the assurance in the Plan and SPD and Policy that the life insurance **will be extended** if disabled. The SPD states unequivocally, "If you become disabled while you are working in covered employment before you reach age 60, but after the effective date of your insurance, the full amount of your life insurance protection **will be extended** (emphasis added) (SPD p. 59). There are no time limits given and the SPD directs the member to "Contact the Fund Office to file proof of your total disability." As noted above, the SPD defines disability as "must prevent you from engaging in any occupation for compensation or profit." (p. 59). There is no mention made of a 9 month requirement here or on page 7 of the Policy which defines disability as noted above.

A number of failures on the part of the Fund by the Fund Manager resulted in the denial to Claimant of the proceeds of her deceased husband's life insurance. These include the cancellation of his life insurance in violation of both FMLA and the Plan, the failure of the Plan Manager to notify Mr. Win on two occasions of his right to convert the life insurance, and the failure to provide Claimant with any necessary forms or information to protect her husband's right to this policy as a disabled person, or general conversion rights, when she called beginning in July of 2019. These errors and inactions violated the Plan, the Policy and the requirements of ERISA.

**ERISA requirements:**

<u>29 U.S.C. § 1022</u>(b) sets for the requirements for a Summary Plan Description.

> A summary <u>plan</u> description of any <u>employee benefit plan</u> shall be furnished to <u>participants</u> and beneficiaries as provided in <u>section 1024(b) of this title</u>. The summary <u>plan</u> description shall include the information described in subsection (b), shall be written in a manner calculated to be understood by the average plan <u>participant,</u> and shall be sufficiently accurate and comprehensive to reasonably apprise such <u>participants</u> and beneficiaries of their rights and obligations under the <u>plan.</u> A summary of any material modification in the terms of the <u>plan</u> and any change in the information required under subsection (b) shall be written in a manner calculated to be understood by the average plan <u>participant</u> and shall be furnished in accordance with <u>section 1024(b)(1) of this title</u>.

The SPD on pages 63-65 sets forth a member's rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). It imposes on the Fund Manager a fiduciary responsibility to operate the Fund prudently and "in the interest of you and other plan participants and beneficiaries". ERISA demands that administrators of these plans act prudently and with loyalty to the participants. The primary goal of ERISA fiduciaries should be acting in the best interest of plan members and beneficiaries.

These responsibilities have been further carved out by law and include:

a. The Responsibility To Act In Accordance With Plan Documents In The Interests Of The Plan Participants and to Provide Adequate And Correct Information:

ERISA statutorily obligates a fiduciary to discharge duties with respect to a plan "solely in the interests of the participants and beneficiaries" with the care, skill, prudence, and diligence a prudent person would use and in accordance with documents and instruments governing the plan. 29 U.S.C. § 1104(a).

An ERISA fiduciary "shall discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries... (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries," 29 U.S.C. § 1104(a) (1), and must exercise its duties "with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use," 29 U.S.C. § 1104(a) (1) (B). ERISA beneficiaries may obtain appropriate equitable relief to redress a fiduciary's breach of these duties *See* 29 U.S.C. § 1132(a) (3); *Varity Corp. v. Howe*, 516 U.S. 489, 515, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996).

"This duty also implicates '[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation.'" *Herman v. Cent. States, Se. and Sw. Areas Pension Fund*, 423 F.3d 684, 695 (7th Cir. 2005) (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 502, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996)).

The Fund Manager clearly breached his responsibility to provide accurate information to both Tun Win, and subsequently to Claimant. Although Courts have differed on the requirement of Plan Administrators to provide written notice of conversion rights, here, those rights were provided. When undertaking to provide notice, it is a breach of fiduciary duty to provide information that is inaccurate and in violation of the Plan. (See e.g., *Dawson-Murdoch v. Nat'l Counseling Grp.,Inc.* 931 F.3d 269, 2019 (employer had fiduciary duty to notify the beneficiary's husband of the termination of coverage and of the opportunity to convert the coverage to an individual insurance policy).

As noted above, notice was mailed to an incorrect address. More compelling is that Mr. Win was still covered under FMLA and, as such, cancellation of his benefits was erroneous and ineffective. No notice was sent to Mr. Win of the Fund cancellation of insurance benefits as of June 2019.

    **b.** The Responsibility To Communicate Material Facts Affecting The Interest Of Beneficiaries:

The Fund Manager as a Fiduciary had the duty to properly notify Mr. Win of the termination of his coverage and of the opportunity to convert the coverage to an individual

insurance policy when the Fund ceased providing life insurance. This right to convert given his disability (with no noted time limit) was specifically set forth in the Plan. An ERISA fiduciary's duty to provide "complete and accurate information" to its beneficiaries "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful" See, e.g. *Bixler v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1302 (3d Cir. 1993). (The Court stated that "Her circumstance was clearly broader than her inquiry") (See also *Shea v Esensten* 107 F3 625 1997: An ERISA fiduciary has the duty not to misinform and to disclose all the material facts affecting a member's interests (as well as a duty to convey complete and accurate information that is material to a Member's circumstances).

An even higher duty has been found when "failure to exercise the right functions as a 'circumstance [] which may result in disqualification, ineligibility, denial or loss of benefits.' *Weaver Bros. Ins. Assocs., Inc. v. Braunstein*, No. 11-5407, 2014 U.S. Dist. LEXIS 78626, at *36-37 (E.D. Pa. June 9, 2014). The Weaver Court found that Weaver Bros. breached its fiduciary duty to Deborah Braunstein when it (1) failed to provide a SPD to Deborah Braunstein that clearly communicated vital information about a plan provision that could lead to the termination of benefits — namely, her right to convert to an individual policy; and (2) misled Deborah Braunstein by informing her that she was covered by the Fortis life insurance policies during her period of disability, without mentioning that her policy would lapse one year after she ceased "active work."

In our case, Claimant has an SPD that unequivocally states the life insurance will be extended upon total disability.

Furthermore, other courts have held that while ERISA might not mandate that a company provide notice in the summary plan description of life insurance conversion privileges, that does not relieve an ERISA fiduciary of its duties to disclose material information and to inform a beneficiary of material facts when it knows the beneficiary is not aware of them.

16

See *Brenner v. Metropolitan Life Ins. Co.*, Civil Action No. 11-12096, 2015 U.S. Dist. LEXIS 36044, 2015 WL 1307394 (D. Mass. Mar. 23,2015)

An even higher duty might apply when the fiduciary is aware that the Plan participant is incapacitated. See e.g. *Watson v. Deaconess Waltham Hosp., 298 F.3d 102* (1st Cir. 2002), stating that an ERISA fiduciary has an affirmative duty to convey material information about a plan to beneficiaries when there is "some particular reason that the fiduciary should have known that his failure to convey the information would be harmful." See also *Brenner v. Metropolitan Life Ins. Co.,* ID.

Many of the above cases also discuss the right to allege the equitable theory of surcharge to make a claimant financially whole based on a breach of fiduciary trust as set forth in *CIGNA Corp v. Amara,* 563 US 421 (2011).

The intent of the Plan was clearly to ensure that the Fund protect the rights of their disabled members. The SPD state "if your group life insurance protection is discontinued, you have the right to convert your Group Life Insurance to an Individual Life insurance policy. Contact the Fund Office for forms to file your proof of your disability."

Conclusion:

The United States Department of Labor, in discussing the history of ERISA, wrote the following:

> The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans. Among other things, ERISA requires that sponsors of private employee benefit plans provide participants and beneficiaries with adequate information regarding their plans. Also, those individuals who manage plans (and other fiduciaries) must meet certain standards of conduct, derived from the common law of trusts and made applicable (with certain modifications) to all fiduciaries. The law also contains detailed provisions for reporting to the government and disclosure to participants... https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/history-of-ebsa-and-erisa

Beginning in July, Claimant made inquiries to obtain information for her terminally ill husband, first by telephone, and then a visit to the Fund office. She was told that any right to convert had passed with no inquiry regarding his disability or other rights under the Plan as a disabled Participant. Clearly, she was seeking information and none was provided by the Fund Manager.

These requirements were clearly breached by the Fund and Fund Manager for all of the reasons set forth above. Tun Win was a long time Union member and Fund participant who fell critically ill and then died and it would be a miscarriage of justice to deny his widow the life insurance proceeds for all the reasons set forth above. Tun Win should have been provided proper notice and allowed to convert and maintain the Policy and Claimant is entitled to the proceeds of Mr. Win's life insurance policy. In the alternative, Claimant is entitled to receive an amount equal to the life insurance policy of $10,000 pursuant to the equitable theory of surcharge relief authorized under ERISA case law.

Thank you for your consideration.

Very truly yours,

Debra J. Wolf
Senior Supervising Attorney
New York Legal Assistance Group
100 Pearl Street
New York, NY 10004

**19**

# EXHIBIT R

# SPIVAKLIPTON LLP

ATTORNEYS AT LAW

Denis P. Duffey Jr.
dduffey@spivaklipton.com
1700 Broadway
New York, NY 10019
T 212.765.2100
F 212.765.8954
spivaklipton.com

March 29, 2021

**VIA SECURE EMAIL AND UPS OVERNIGHT MAIL**
Debra Wolf, Esq.
Senior Supervising Attorney
New York Legal Assistance Group
7 Hanover Square
New York, NY 10004

Re:    **Teamsters Local 277 Welfare Fund**
**Win Life Insurance appeal**

Dear Ms. Wolf:

As you know, this firm represents the Teamsters Local 277 Welfare Fund (the "Fund"). On behalf of the Board of Trustees, I am writing in response to your letter dated March 8, 2021 (the "Appeal Letter") setting forth the appeal (the "Appeal") of the Fund's denial of a life insurance claim (the "Claim") made by the surviving spouse (the "Claimant") of a participant (the "Participant"). The Appeal was considered and decided at the Board's meeting on March 25, 2021. Prior to the meeting, the Board was provided with the following documents in connection with the Appeal:

1. The Appeal Letter, and the Exhibits thereto
2. My November 2, 2020 Letter to you responding to your request for additional information, together with the Attachments thereto.
3. My letter to you dated August 4, 2020, setting forth the Fund's denial of the Claim (the "Denial Letter"), with enclosures.
4. Your letter dated May 9, 2020 (the "Claim Letter"), with enclosures.

For the reasons set forth below, the Board has denied the appeal. The first portion of the discussion below is set forth in sections paralleling those in the Appeal Letter, and contains summaries of the Claimant's arguments as stated in the Appeal Letter together with the Fund's responses. The ensuing sections address the case law cited in the Appeal Letter, and describe a discretionary determination of the Trustees pursuant to the Trust Agreement.

## DISCUSSION

### The Participant's Address

Claimant's Argument:  The Claimant contends that the Appeal should be granted because the Cancellation Notice was sent to the Participant's old address, such that he was not able to timely convert the benefit into an individual life insurance policy.  The Appeal Letter states that correspondence from Alicare concerning the Fund's medical benefits was, however, sent to his correct address, including a letter dated May 9, 2019, two weeks after the April 24, 2019 Cancellation Notice.  The Claimant argues that this shows that the Fund had the Participant's current address and that the sending of the Cancellation Notice to the old address was an error by the Fund.

Response:    As noted in the Denial Letter, the SPD advised participants to notify the Fund if they change their home address, and the Cancellation Notice was sent to the address on file and not returned as undeliverable.[1]  (See SPD at 9.)  The Denial Letter stated that the Fund properly relied on the address on file and reasonably assumed that the Cancellation Notice had been received.

In the Appeal Letter, the Claimant does not contend that the Participant ever notified the Fund of the change of address or that the Claimant did so.  Fund Manager Frank Asprea advises that the Fund was not notified of a new address until October 2019, when the Claimant visited the Fund Office with a social worker.  The Appeal thus does not affect the conclusion, reflected in the Denial Letter, that any non-receipt of the Cancellation Notice by the Participant was attributable to the lack of any change-of-address notice to the Fund from the Participant, rather than being a mistake by the Fund.

As noted above, the Appeal Letter contends that correspondence from Alicare to the address that was current for the Participant in May 2019 shows that the Fund had the correct address and that the sending of the Cancellation Notice to the old address was an error by the Fund.  That Alicare had the Participant's current address does not, however, show that the Fund did.  Mr. Asprea advises that health claims are often processed by Alicare with no Fund involvement other than payment to the provider, such that participant addresses that Alicare has would typically come from providers.  Mr. Asprea states that when claims are submitted to the Fund Office, they are simply sent in batches to Alicare, and are not examined for updated address information.  Moreover, Mr. Asprea notes that address updates for the Fund files must come from the

---

[1] The Denial Letter also stated that the Fund was not otherwise contacted concerning the Participant until October 2019, as an additional reason why it was reasonable for the Fund to assume the Cancellation Notice had been received.  The Appeal Letter asserts that, according to the Claimant, the Claimant contacted the Fund in July 2019, spoke to Mr. Asprea, and communicated that she was calling about life insurance.  This contention is addressed below, but even if it were accepted as accurate, it does not affect the discussion in the text concerning the issue of the Participant's address.

participant, as indicated in the SPD, and thus even if the Fund seen documentation from Alicare indicating a different address, that would not have provided a proper basis for changing the address used for providing Participant with notice. Claimant's arguments concerning the Participant's address do not provide grounds for granting the Appeal.

## Family and Medical Leave Act (FMLA)

Claimant's Argument: The Appeal Letter also contends that the cancellation of the Participant's life insurance benefit effective May 1, 2019 violated his rights under the FMLA and his right under the SPD provision stating that a participant "can continue all of your medical coverage and other benefits offered through the Fund" during FMLA leave (see SPD at 12), and that the cancellation should therefore be deemed ineffective. The Appeal Letter notes that Mr. Asprea received an email from the Participant's employer stating that he "has been on FMLA and recently resigned," and contends that Mr. Asprea violated his fiduciary duty to assess the Participant's purported right to maintain coverage during his medical leave as well as his duty to inquire further on behalf of the Participant.

Response: The email from the employer did not say that the Participant was presently on any FMLA leave; rather it said that he "has been" on FMLA and that he "recently resigned," indicating that any such leave had been terminated by the resignation. Mr. Asprea advises that he understood it that way and accordingly sent the Cancellation Notice to the address on file. The documents provided with the Appeal indicate that the Participant was granted FMLA leave by letter dated May 3, 2019, and that the leave was exhausted on May 6, 2019, but the Fund had no notice thereof. We are aware of no authority indicating that Mr. Asprea or the Fund had a fiduciary duty to investigate further or take any other steps beyond those taken in these circumstances, and the Claimant has cited none. (See section entitled Caselaw Cited in Appeal Letter below.) Further, the Appeal Letter does not establish that Mr. Asprea was acting in a fiduciary, rather than a non-fiduciary ministerial capacity, in responding to the email from the employer or otherwise. See 29 C.F.R. § 2509.75-8.

Moreover, the FMLA placed no obligation on the Fund. Rather, it obligates an employer to maintain an employee's coverage under any group health plan for the duration of the FMLA leave. See 26 USC § 2614(c). It also prohibits the loss of employment benefits accrued prior to the date the leave commenced, but that obligation is enforceable against the employer. Id. §§ 2614(a), 2615, 2617. As noted, the employer notified the Fund that the Participant had resigned. Neither the FMLA nor other applicable law required the Fund to inquire further or take any other actions beside those taken.

Further, even if FMLA leave could have extended the Participant's life insurance coverage, it could only have extended it by a few days, since the FMLA leave was exhausted on May 6. The Claimant does not contend and nothing indicates that cancellation of his benefit on May 7 rather than May 1 would have enabled the Participant to retain his benefit.

**First Conversion Right**

Claimant's Argument: The Appeal Letter argues that the Participant was within a 90-day window to convert his Fund life insurance benefit into an individual policy when Claimant allegedly contacted Mr. Asprea in July 2019, and that Mr. Asprea incorrectly told her it was past the deadline at that point. The Appeal Letter also argues that the Participant should have been "given an opportunity to convert when his benefits would have been correctly terminated at the end of his FMLA leave." It further notes that the SPD stated that the life insurance benefit would continue during disability, suggesting that the benefit could not have terminated on May 1 as stated in the Cancellation Notice and that the conversion period could not have commenced until later.

Response:    The SPD contains a section entitled, "How to Convert Your Life Insurance Coverage," which states, "If your Group Life Insurance coverage ends, you will have the opportunity to convert your coverage to an individual policy. . . . If you choose to convert your group insurance, you must do so within 31 days of the date your group insurance ends." (SPD at 60.) The Policy states if the individual is notified of the right to convert within 15 days before or after a termination of coverage, the individual must convert within 31 days of termination. (Policy at 16.) It also says that if the individual is not notified within that period, the time to apply for conversion is extended to "the earlier of 45 days after notice is given or 90 days after" the termination of coverage. (Id.)

Here, the Cancellation Notice was dated April 24, 2019, which is within 15 days of the May 1, 2019 cancellation date, and so under both the SPD and the Policy, the Participant had 31 days from termination to convert, i.e., until June 1, 2019. As noted above, any non-receipt of the Cancellation Notice by the Participant was attributable to the lack of any change-of-address notice to the Fund from the Participant, rather than being a mistake by the Fund. Thus there was no extension of the conversion period.

Even if the 90-day period applied, the Claimant has not shown that the Participant lost any conversion right due to the conduct of the Fund. The Appeal Letter asserts that the Claimant called Mr. Asprea in July 2019 and told him she was calling about life insurance. But the statement of the Claimant included with the Appeal does not support this assertion. Rather, it says:

In July of 2019 I was told that my husband's illness was terminal. Understanding the seriousness of my husband's illness, I was concerned about his benefits including life insurance. I called the Fund first in July of 2019. I spoke with Mr. Asprea and told him my husband was very ill and I was calling about his union benefits. I speak Burmese with some English and there was no interpretation available. He asked for the date of birth of my husband which I gave him and Mr. Asprea told me he is not eligible yet for his pension. He did not provide any other benefit information during this call.

I called a second time at the end of July and spoke to Mr. Asprea and asked for an interpreter. He told me the Fund did not have interpreters.

(Appeal Ex. A.) This statement merely asserts that the Claimant was concerned about the Participant's benefits including life insurance through the union, and that she called Mr. Asprea and said she was calling about "his union benefits." It does not say that the Claimant asked about life insurance in any July 2019 call, and does not otherwise describe any conversation with Mr. Asprea about life insurance prior to October 2019. Given that, under the SPD and the Policy, the 31-day period for Participant to convert had expired by July 2019, there would have been no reason for Mr. Asprea to address life insurance benefits in response to a general inquiry about union benefits. Thus even if the 90-day period had applied, the Appeal fails to show any act or omission reasonably attributable to the Fund that caused the Participant to lose the opportunity to convert.

Further, Mr. Asprea has no recollection or record of any conversation with the Claimant in July 2019, and states that he definitely did not have any conversation with her about life insurance until October 2019, when she came to the Fund Office with a social worker. The Claimant's own statement also describes the October 2019 visit as involving discussion of life insurance. (Id.) The Claimant's statement and Mr. Asprea's account are consistent in identifying the October 2019 meeting as the first time at which the Claimant raised the issue of life insurance with the Fund. By that time, however, even the 90-day period from the May 1, 2019 cancellation had expired.

As to the contention in the Appeal Letter that the Participant should have been given an opportunity to convert when his FMLA leave ended, as noted above, the Fund had been informed that the Participant resigned, not that he was on any continuing FMLA leave, and the FMLA obligated the employer to maintain benefits, but did not obligate the Fund to continue benefits in the absence of contributions. Further, the FMLA leave ended 5 days after the cancellation, and the Appeal Letter does not show that another conversion notice at that time would have caused the Participant to preserve his benefit. Thus the Claimant's FMLA-based arguments do not provide a basis for granting the Appeal.

The suggestion that the language in the SPD concerning the disability extension delayed termination of the coverage and the commencement of the conversion period past May 1, 2019 is unsupportable. Participant was not eligible for any disability extension at the time of the cancellation. The Policy states that for purposes of disability extension, "[a]n individual is totally disabled if he or she has not received pay for any work for 9 continuous months," and the individual must be insured at the time he becomes disabled within this definition. (Policy at 17.) As noted in the Denial Letter, if it is assumed that the Participant received no pay for any work after he fell ill February 2019 (according to the Appeal Letter), the earliest month in which the Participant could theoretically have qualified as totally disabled within the meaning of the Policy was November 2019. By that time, however, he was not insured and therefore was ineligible for a disability extension, both because his coverage lapsed on May 1, 2019 and was

not converted to an individual policy, and because the Fund ceased providing benefits after June 30, 2019. The disability extension is thus irrelevant to the Participant's conversion deadline.

**Purported Second Conversion Right at Termination of Policy or Disability**

Claimant's Argument: Claimant notes that the SPD and the Policy provide that life insurance will be extended during a disability occurring before age 60, and that the Policy states that if the group policy is terminated, the disabled individual will have the right to convert to an individual policy. As to this conversion right, the Appeal Letter states, "No time limits are given."

The Appeal Letter then asserts that the Participant did not receive the notice of termination of Fund benefits effective June 30, 2019, and that he should have had the right to convert based on that termination. It states, "Had he been notified and allowed to convert as was his right under the Plan and Policy, he would have continued to be covered and qualify for the Policy waiver of premium."

The Appeal Letter further argues that the 9-month period without pay set forth in the Policy to qualify for a disability extension should not apply because it is not set forth in the SPD and because the Policy does not include the 9-month period in the definition of Total Disability in the Definitions section of the Policy.

Response: The Appeal Letter's argument that no time limit applies to conversion after policy termination under the provisions on disability extension in the SPD and the Policy is not supportable. Both the SPD and the Policy contain general conversion provisions setting time limits on conversion, as described above. That the SPD and Policy provisions on disability extension do not expressly state a time limit when referring to conversion cannot reasonably be construed to mean that there is no such time limit at all; rather, the only plausible reading of the documents is that the background time limits on conversion apply.

Claimant's contention that Participant was denied another opportunity to convert upon the termination of Fund benefits is also unpersuasive. As noted, Claimant was not entitled to a disability extension at the time of the May 1 cancellation of his coverage and he did not convert. Only those with active group coverage have conversion rights, and the Participant did not have such coverage at the time Fund benefits were terminated on June 30. Moreover, Claimant's contention that if he had been given another opportunity to convert, he would have done so and paid the premiums therefor until he qualified for a disability extension and premium waiver (which could not have occurred prior to November 2019) is entirely speculative. Again, the Fund acted properly by sending the Cancellation Notice to the address on file, and the Participant's coverage terminated when he failed to convert within the applicable period.

As to Claimant's contention that the 9-month period for disability extension should not apply, that the SPD did not specify that period does not provide a basis for granting the Appeal. The SPD advised the Participant to contact the Fund Office for forms to file proof of total disability (SPD at 59), indicating that whether the standard for disability had been met would require further action and determination. The SPD further stated, again, that the SPD was subject to official Fund documents (SPD cover letter), which include the Policy as stated in the Denial Letter. The Policy expressly stated the 9-month period. That it contained a general definition of "total disability" in the definitions section that did not specify the 9-month period does not write the 9-month period out of the Policy provisions detailing the applicability of the disability extension.

In sum, Claimant's arguments concerning a second conversion right do not provide a basis for granting the Appeal.

**ERISA Obligation to Provide Accurate Information**

Claimant's Argument:  The Claimant argues that Mr. Asprea breached his responsibility to provide accurate information to the Participant and Claimant as required by ERISA because he, again, purportedly mailed the Cancellation Notice to an incorrect address and canceled the Participant's benefits while he was covered by FMLA.

Response:    First, as noted, the Appeal Letter does not establish that Mr. Asprea was acting in a fiduciary, rather than a non-fiduciary ministerial capacity.  See 29 C.F.R. § 2509.75-8. Further, the mailing of the Cancellation Notice to the address on file cannot be considered a mistake by the Fund, the Fund had no notice of any pending FMLA leave, and the FMLA did not impose obligations on the Fund.

Claimant's Argument:  The Appeal Letter also appears to argue that the Fund breached its fiduciary duty by failing to notify the Participant of his right to convert the Fund life insurance coverage to an individual policy in connection with a disability, as follows:

> The Fund Manager as a Fiduciary had the duty to properly notify Mr. Win of the termination of his coverage and of the opportunity to convert the coverage to an individual insurance policy when the Fund ceased providing life insurance. This right to convert given his disability (with no noted time limit) was specifically set forth in the Plan. . . .

> In our case, Claimant has an SPD that unequivocally states the life insurance will be extended upon total disability.

> . . .

> The intent of the Plan was clearly to ensure that the Fund protect the rights of their disabled members. The SPD state[s] "if your group life insurance protection

is discontinued, you have the right to convert your Group Life Insurance to an Individual Life insurance policy.  Contact the Fund Office for forms to file your proof of your disability."

(Appeal Letter at 15-17.)

Response:  First, as noted, the Fund did provide notice of the ability to convert the Fund life insurance coverage to an individual policy on termination of the Fund coverage both in the SPD, as the Appeal Letter acknowledges, and in the Cancellation Notice.  ERISA does not require individualized notice of the right to convert life insurance benefits, and thus the Appeal has shown no basis for a claim that the Fund violated ERISA.  See Howard v. Gleason Corp., 901 F.2d 1154 (2d Cir. 1990) (employer's failure to provide notice of right to convert on termination did not violate ERISA, where NY statute requiring such notice was preempted); Walker v. Fed. Ex. Corp., 492 Fed. Appx. 559 (6th Cir. 2012) (no ERISA violation where SPD contained notice of conversion right, and defendants mailed conversion notice to last known addresses of participant and had no reason to believe addresses were not accurate).  Further, there is authority that ERISA does not require an SPD to contain notice of a life insurance conversion right.  Prouty v. Hartford Life & Accident Ins. Co., 997 F. Supp. 2d 85, 91 (D. Mass. 2014).  Further, the Appeal asserts in this argument that Mr. Asprea was a fiduciary, but it has not established that Mr. Asprea was acting in a fiduciary capacity in taking the actions at issue.  The Appeal has thus not shown any ERISA violation by the Fund as to notice of any conversion right.

The Claimant's arguments that the Participant was entitled to an additional right to convert under the disability provisions are addressed in the prior section concerning the purported second conversion right.

To the extent that the Appeal Letter is contending that the Fund erred by failing to provide more details about the disability extension or conversion at the termination of a disability, the issue is moot because the Participant was never eligible for a disability extension (and it is entirely speculative that he could have been under some theoretical chain of circumstances), as explained above.  Further, the Fund had no notice that the Participant was disabled within the meaning of the Policy at the time it sent the Cancellation Notice, and in fact he was not, so there would have been no reason to provide any further information about the disability extension, even if there were any obligation to do so.

The Appeal Letter suggests that the statement in the SPD that the life insurance benefit would be extended based on disability indicated a more unrestricted benefit than the Policy provided, but this does not provide a basis for granting the Appeal.  First, the SPD summarized the Plan's life insurance benefit, and was not legally binding as to that benefit.  See Cigna v. Amara, 563 U.S. 421, 438 (2011).  Further, there is no indication that the Participant relied to his detriment on or was otherwise harmed by the suggested overbreadth of the SPD description of the disability extension.  Moreover, as noted above, the SPD advised the Participant to contact the Fund Office for forms to file proof

of total disability, indicating that more would be required to establish a disability for purposes of the extension.  The SPD also, as noted, stated that the SPD was governed by official Fund documents, which include the Policy.

Again, the Fund properly sent the Cancellation Notice to the address on file, and provided all requested information thereafter.  The Appeal does not show that any failure to provide accurate and complete information on the Fund's part caused the loss of any benefit to which the Participant was entitled.

## Discretionary Determination of Trustees

Additionally, the Fund's Trust Agreement provides as follows:

> The Trustees are expressly authorized to negotiate for, obtain, and maintain policies of group life, group accident, and group health insurance or such other insurance coverage as may be determined necessary and desirable by the Trustees for the payment to Participants and Beneficiaries of such benefits as now or hereafter may be authorized or permitted by law.  Such policies of insurance shall be in such forms and in such amounts and may contain such provisions and be subject to such limitations and conditions as the Trustees in their discretion may from time to time determine.
> The policies of insurance shall cover such Participants and Beneficiaries as the Trustees shall from time to time determine are eligible for benefits as herein provided. The Trustees . . . may take any action respecting each such contract or policy and the insurance provided thereunder which they, in their discretion, may deem necessary or advisable. . . .

(Trust Agreement § 5.3, enclosed.)  The Trustees have determined in their discretion that under the circumstances, the Policy and the Fund life insurance benefit thereunder do not provide coverage for Participant under a disability extension or otherwise.

## Caselaw Cited in Appeal Letter

The Appeal Letter cites Herman v. Cent. States, Southeast & Southwest Areas Pension Fund et al., but in that case the Court rejected a claim that a pension plan violated its fiduciary duty by "failing to disclose key details about the Plan, by leaving important terms undefined and by interpreting those terms inconsistently," where there was no showing of "deliberate misleading" by the fund.  423 F. 3d 684, 695 (7th Circuit 2005). The Appeal Letter also cites Varity v. Howe, in which the Supreme Court similarly found that the administrator of a benefit plan committed a fiduciary breach by deliberately misleading participants about the future of plan benefits.  516 U.S. 489, 506 (1996).  Here there is no allegation or indication of any deliberate misleading, and thus these cases are irrelevant.

The Appeal Letter also cites <u>Dawson-Murdock v. Nat'l Counseling Grp., Inc.</u>, 931 F.3d 269 (4th Cir. 2019), which is also inapposite. The plaintiff in the case alleged that the employer violated its fiduciary duty by (1) failing to inform or misinforming a participant about his eligibility for life insurance, and failing to inform him that he had the option to convert the coverage, and (2) advising the participant's surviving beneficiary that she did not need to appeal the insurance company's benefit denial. <u>Id.</u> at 274. The lower court dismissed these claims on the ground that the complaint failed to adequately allege that the employer was a fiduciary, but the Court of Appeals reversed, holding that the allegations of the employer's fiduciary status were sufficient. <u>Id.</u> at 276-81. Neither court actually found any fiduciary breach, and thus the case does not support the Claimant's fiduciary breach argument.

The Appeal Letter cites <u>Bixler v. Cent. Pa. Teamsters Health & Welfare Fund</u>, 12 F.3d 1292, 1302 (3d Cir. 1993) for the proposition that an ERISA fiduciary's duty to provide complete and accurate information "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." It also cites <u>Shea v. Esensten</u>, 107 F.3d 625 (8th Cir. 1997), for the similar proposition that an ERISA fiduciary has the duty not only to not misinform, but also to disclose all the material facts affecting a member's interests. And it cites <u>Watson v. Deaconess Waltham Hosp.</u>, 298 F.3d 102 (1st Cir. 2002), for the propositions that a fiduciary has a duty to convey material information to beneficiaries when there is "some particular reason that the fiduciary should have known that his failure to convey the information would be harmful," and that it may have a higher duty if it is aware that the participant is incapacitated.

These cases are from other jurisdictions and not controlling on the Fund, and the standard as stated in <u>Shea</u> does not appear to have been adopted by the Second Circuit. Indeed, the Southern District of New York expressly declined to follow <u>Shea</u> in <u>Weiss v. Cigna Healthcare</u>, 972 F. Supp. 748, 755 n.6 (SDNY 1997). Moreover, as set forth on page 8 above, relevant caselaw indicates that there was no fiduciary obligation that was breached by the Fund in the circumstances at issue.

Further, in <u>Watson</u>, the Court rejected a claim of fiduciary breach based on fiduciaries' failure to inform a participant of the effect of his changing employment status, of which it knew, on his eligibility for long-term disability benefits. 298 F.3d 109-16. That case also does not stand for a general proposition that a higher duty is owed when a fiduciary knows a beneficiary is incapacitated, as Claimant asserts; rather, it merely states that the plaintiff had a "stronger argument that the Human Resource employees should have known he would be interested in partial disability benefits," where they were aware of his health issues. But again, the Court rejected the plaintiff's claim of fiduciary breach based on allegedly inadequate or insufficiently personalized disclosure.

Even if such standards did apply, the Fund provided the information requested and relevant to the Participant's situation and, as noted, the Appeal does not show that

any failure to provide accurate and complete information on the Fund's part caused the loss of any benefit to which the Participant was entitled.

The Appeal Letter also cites Weaver Bros. Ins. Assocs., Inc. v. Braunstein, No. 11-5407, 2014 U.S. Dist. LEXIS 78626 (E.D. Pa. June 9, 2014), in which the court found a plan administrator breached its fiduciary duty by failing to clearly describe the right convert a life insurance benefit to an individual policy in the SPD and misleading a participant by telling her that her life insurance policy continued during her disability, without advising her that the coverage would terminate one year after she ceased active work, causing the participant to lose the life insurance benefit. The Appeal Letter also cites Brenner v. Metropolitan Life Ins. Co., Civil Action No. 11-12096, 2015 U.S. Dist. LEXIS 36044 (D. Mass. Mar. 3, 2015) (Report & Recommendation of Magistrate Judge), adopted, 2015 U.S. Dist. LEXIS 36995 (1st Cir. Mar. 23, 2015), where the Court held that an employer breached its fiduciary duty by assuring the plaintiff she had adequately secured life insurance and failing to provide her with notice of the right to convert the coverage, causing her to lose the benefit.

Again, these cases are from other jurisdictions and are not controlling on the Fund, and relevant caselaw indicates that there was no fiduciary obligation that was breached by the Fund in the circumstances at issue. (See page 8 above.)

Weaver and Brenner are also inapposite because the Fund did provide clear and simple notice of the conversion right, both in the SPD and in the Cancellation Notice, and the Fund did not make any misleading statements that led the Participant to lose benefits to which he was entitled. As noted, he was not entitled to a disability extension because he was not insured when he became disabled within the meaning of the Policy.

Finally, the Appeal Letter notes that under Cigna v. Amara, 563 U.S. 421 (2011), an individual can seek the equitable remedy of surcharge to obtain a monetary make-whole remedy for fiduciary breach. The Court in that case, however, emphasized that such a remedy is only available where it is shown that the violation injured the individual. Here, as noted, the Appeal has not shown that any problem in communication attributable to the Fund caused the Participant harm.

———————

The Claimant has the right to review, free of charge, documents relevant to the Claim. A document, record or other information is relevant if it was relied upon by the Plan in making its decision; if it was submitted, considered or generated in connection with your claim (regardless of whether it was relied upon); if it demonstrates compliance with the Plan's administrative processes for ensuring consistent decision-making; or if it constitutes a statement of Plan policy regarding the denied treatment or service.

The Claimant and the Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to

Debra Wolf, Esq.
March 29, 2021
Page 12 of 12

contact your local U.S. Department of Labor Office and your State insurance regulatory agency.

If the Claimant disagrees with the decision of the Board of Trustees, she has the right to bring a civil action under ERISA § 502(a).

Very truly yours,

Denis P. Duffey Jr.

Enclosure

cc:     (via UPS overnight mail)
        Khin Sai Kyi
        2261 West 7th Street
        Brooklyn, NY  11223

        (via encrypted email)
        Frank Asprea, Fund Administrator
        Eric R. Greene

AMENDED AND RESTATED
AGREEMENT AND DECLARATION OF TRUST

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
LOCAL 277 WELFARE FUND

This Amended and Restated Agreement of Trust, made
and entered into this 28th day of April , 1976 , to be
effective as of January 1, 1976, by and between the INTERNA-
TIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 277, presently having
its headquarters at 27 Union Square, in the Borough of Man-
hattan, City of New York (hereinafter called the "Union"),
the BUTTER & EGG MERCHANTS ASSOCIATION, INC. (hereinafter
called the "Merchants Association"), and various Employers in
the butter, cheese, and egg industry doing business in and
about the City of New York, who have adopted this Agreement
and Declaration of Trust, and William Bebbins, Milton Cohen,
Harry Dubin, Joseph Festa, Joseph Nestola (hereinafter referred
to as "Union Trustees") and Marvin Braunstein, Hyman Hurwitz,
Frederick C. Lowenfels, Alfred Rich, Stanley Schwartz (herein-
after referred to as "Employer Trustees"), all hereinafter col-
lectively called the Trustees.

W I T N E S S E T H :

WHEREAS, there has heretofore been entered into an
Agreement and Declaration of Trust, made and entered into the
1st day of September, 1955 by and between the Union, the

welfare benefits to eligible Employees, their families and dependents in accordance with the plan of benefits to be established hereunder by the Trustees.

C.  To establish and accumulate such reserve funds as the Trustees, in their discretion, deem necessary and desirable for the proper execution of the Trust herein created.

5.3  Procurement of Insurance.  The Trustees are expressly authorized to negotiate for, obtain, and maintain policies of group life, group accident, and group health insurance or such other insurance coverage as may be determined necessary and desirable by the Trustees for the payment to Participants and Beneficiaries of such benefits as now or hereafter may be authorized or permitted by law. Such policies of insurance shall be in such forms and in such amounts and may contain such provisions and be subject to such limitations and conditions as the Trustees in their discretion may from time to time determine.

The policies of insurance shall cover such Participants and Beneficiaries as the Trustees shall from time to time determine are eligible for benefits as herein provided.  The Trustees may exercise all rights and privileges granted to the policy holder by the provisions of each contract or policy of insurance, and may agree with the insurance carrier to any alteration, modification or amendment of such contract or policy, and may take any action respecting each such contract or policy and the insurance provided there-

under which they, in their discretion, may deem necessary
or advisable.  Such insurance carrier shall not be required
to inquire into the authority of the Trustees with regard
to any dealings in connection with such contract or policy.

     5.4  Investments.  The Trustees shall have the
power and authority, in their discretion, to invest and
reinvest such funds as are not necessary for current ex-
penditures or liquid reserves, in such investments which
appear to the Trustees, in their discretion and consistent
with their fiduciary obligations, to be in the best interest
of the Trust Fund and its Employee Beneficiaries judged by
then prevailing business conditions; including but not li-
mited to shares of stock, whether common or preferred, or
other evidences of ownership, including but not limited to
securities or other interests in mutual funds or so-called
"investment trusts", notes or other evidences of indebtedness
secured or unsecured, and other property, real or personal,
including improved or unimproved real estate and equity
interests in real estate, whether or not such investments
are then legal for Trust Funds under the laws of the State
of New York or any other state.

     The Trustees shall have the authority, in
respect to any property, real or personal, held by them
as Trustees, to exercise all such rights, powers and pri-
vileges as might be lawfully exercised by any person owning
similar property in his own right.